[No. G036883. Fourth Dist., Div. Three. Dec. 12, 2007.]

ZACHARY CASELLA, Plaintiff and Appellant, v.
SOUTHWEST DEALER SERVICES, INC., et al., Defendants and
Appellants.

**COUNSEL**

Lee A. Wood & Associates, Lee A. Wood, Jeffrey R. Salberg; Jorgensen & Salberg and Richard Allen Jorgensen for Plaintiff and Appellant.

Law Offices of J. Scott Russo, Russo & Duckworth and J. Scott Russo for Defendants and Appellants.

**OPINION**

**FYBEL, J.—**

## INTRODUCTION

Plaintiff Zachary Casella sued his former employer, SouthWest Dealer Services, Inc. (SouthWest), and its president, Eric Hamann (collectively, defendants), for wrongful termination in violation of public policy, fraud, and fraudulent inducement of employment in violation of Labor Code section 970. Casella claimed his employment was terminated because he reported SouthWest's participation in some of its car dealership clients' fraudulent business practices. The parties refer to these practices as "payment packing." The payment-packing practice in this case involved car dealership sales personnel

quoting inflated monthly payment amounts for the cars to customers in order to hide the true cost of aftermarket products, thereby facilitating the sale of such products. Casella further alleged defendants wrongfully induced him to come to work for SouthWest by failing to disclose SouthWest's involvement in these fraudulent activities.

SouthWest filed a cross-complaint against Casella for misappropriation of trade secrets and breach of the parties' employment agreement. SouthWest dismissed its misappropriation of trade secrets claims before trial.

A jury returned a special verdict in favor of Casella on each of his claims against defendants, and awarded Casella a total of $480,003. The jury also found in favor of Casella with regard to SouthWest's breach of the employment agreement claim.

Defendants appealed from the judgment. Casella appealed as well, contending the trial court erred by failing to award him more prevailing-party attorney fees. We affirm the judgment in full.

We reject each of defendants' contentions of error as follows.

1. We hold the public policy underlying Casella's wrongful termination in violation of public policy claim is tethered to Penal Code section 487 which proscribes theft by false pretense through fraudulent misrepresentations. Thus, the trial court did not err by refusing to dismiss that claim.

2. Defendants' challenge to the trial court's denial of their motion for judgment notwithstanding the verdict (JNOV) fails on the grounds that substantial evidence (1) showed that SouthWest required Casella to aid and abet its car dealership clients in fraudulent activities as defined in Penal Code section 487, and (2) supported the inference that at the time he hired Casella, Hamann knew Casella would be required to help track the fraudulent activities of those SouthWest clients.

3. Defendants have failed to show the trial court abused its discretion in making evidentiary rulings which prejudiced them.

4. Defendants have failed to show the trial court erred in instructing the jury.

5. The trial court properly denied defendants' motion for a new trial after discharging its responsibilities under Code of Civil Procedure section 657.

With regard to Casella's cross-appeal, we conclude the trial court correctly declined to award Casella the portion of attorney fees he incurred in prosecuting his tort claims against defendants because here, as in *Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698 [75 Cal.Rptr.2d 376] (*Exxess Electronixx*), the attorney fees provision contained in the employment agreement expressly limits the recovery of prevailing-party attorney fees to those incurred in seeking to enforce that agreement.

## SUMMARY OF FACTS IN SUPPORT OF THE JUDGMENT

In 2002, Casella inquired about employment with SouthWest. At the time, Casella worked in New York for Toyota Financial Services as an area sales manager. SouthWest, which is headquartered in Orange County, is in the business of "sell[ing] its aftermarket auto products to auto dealerships and help[ing] train auto dealership Finance & Insurance ('F&I') salespersons on how to promote and sell SouthWest's products."

After a telephone conversation with Hamann, SouthWest's president, Casella traveled to California to interview for a position with SouthWest. Hamann told Casella that SouthWest had a sales representative position available, and Hamann and Casella discussed Casella's qualifications. Hamann offered employment to Casella; he accepted and moved to California. Casella entered into a written employment agreement with SouthWest on his first day of work in November 2002.

Casella was hired to replace Jason Glass, who had been promoted, and to assume some of Glass's job responsibilities. Glass took Casella to dealerships in his territory, including Long Beach Nissan and three dealerships owned by Greg Spreen (the Spreen dealerships), including Spreen Honda and Saturn of Loma Linda. Glass taught Casella how to create written reports for Spreen Honda.

Casella was trained by Glass how to prepare a document called the "F & I" (finance and insurance) managers report and the sales managers report. Finance and insurance managers "are the people after you purchase a vehicle," who "do all the DMV [Department of Motor Vehicles] paperwork and all the registration and all that. Then they offer you extended warranties and other products that you could purchase before you sign your final contract."

The sales managers reports contained a column labeled "P.A." which stood for "payment assistance" or "leg." When a dealer's sales representative and customer struck a deal for the purchase of a car, the sales representative or

sales manager would calculate the monthly payment. If and when the sales representative or sales manager quoted the customer an inaccurately high monthly payment, the difference between the true monthly payment and that quoted by the sales manager constituted "leg." Leg was built into such transactions, a practice Casella referred to as "payment packing" for "the purpose of selling aftermarket products. It assist[ed] the finance manager in selling those extra products that they offer you in the finance department." The finance and insurance managers then used that leg in order to entice customers to agree to purchase additional products offered at inaccurately low costs. The customer was not made aware that leg had been built into the deal. The sales managers reports tracked "the average amount of leg that the sales manager built into the deal for the finance manager." Another column in the reports, entitled "Percentage P.A.," referred to "the percentage of deals that actually came back with leg in them."

Casella immediately questioned Glass about what he was being trained to do with regard to generating reports containing such information "[b]ecause just glancing at it knowing what I knew, I knew there was something wrong with . . . keeping track of that, the fact that they were even doing that. But then to keep track of it on top of that is unbelievable." Casella thought the practice was illegal, "definitely unethical," and "if nothing else, very dangerous for [SouthWest] that was keeping track of it." He understood that, in preparing those reports for certain dealerships, "I was being asked to track the illegal payment packing or leg that [SouthWest's] business partner was engaging in." Glass told Casella, "it is kind of illegal, but the dealer wants it done, so that's the way we got to do it."

Notwithstanding his reservations about generating those reports, Casella generated and distributed copies of them at the Spreen dealerships' sales managers meetings, attended by finance managers, sales managers and Greg Spreen. The evidence showed the reports were used for the purposes of discussing "how well the F & I managers were selling the products" and of showing "how well the sales managers were setting up the finance managers in terms of how much leg they were giving them." Casella testified he was bothered "people are being lied to and deceived in their car purchase," SouthWest was "doing something illegal," and he was being asked to "participat[e] in keeping track of that." He testified, "I felt that we were aiding it because we were encouraging it, inasmuch as you measure something when you calculate averages, and put numbers, you know, rank them 1 through 5 and essentially you are critiquing the performance in that area. And, yeah, when you do that, essentially in my mind you are endorsing that behavior, that practice."

In January 2003, Casella attended the SouthWest finance and insurance training school conducted by SouthWest's head trainer, Peter Velau. Casella

told Velau about "what was going on at the Spreen dealerships and the reports I was being asked to prepare." Casella told Velau that he was concerned because he thought there "was some type of payment packing going on" at the Spreen dealerships which might be illegal. Velau testified that "there are many, many ways that [payment packing] could be defined, depending on the person you are talking to, depending on the action that is happening." He stated, "one definition" is "a payment is quoted to a customer that was incorrect" which incorporates the cost of products that have not been properly disclosed to the customer. Velau also testified that if what Casella thought might be happening was happening, "there could be a problem." He told Casella to "just make sure our logo doesn't appear on any dealer reports and make sure it doesn't appear on the sales, that manager's report that you are doing."[1] Velau recommended Casella speak to Hamann about his concerns.

One or two days after speaking with Velau, Casella discussed his concerns about leg with Hamann and told him what he had told Velau. Casella thought Hamann's reaction was "a bit strange" in that "[h]e seemed to indicate that he wasn't real . . . concerned." Hamann said something to the effect of, "well, you know, if you are more comfortable calling it rate spread, go ahead and call it rate spread or rate spread profit. [¶] And he went on to some sort of explanation about how, you know, dealers often mark up the loan." Casella testified that he "already knew that" and "thought it was a bit odd that [Hamann] was saying that to me, because that's not really what I was talking about." Hamann said, "[c]all P.A. or payment assistance, call it rate spread profit, if it makes you feel better."

On April 3, 2003, Hamann informed Casella his employment with SouthWest was terminated effective immediately. Hamann told Casella that his employment was being terminated because of complaints he had received about Casella, including complaints from Mishel Jolly, AutoNation's regional finance director for Southern California. AutoNation is a very large dealership and one of SouthWest's larger customers.

## PROCEDURAL BACKGROUND

In September 2003, Casella sued Southwest and Hamann contending, inter alia, that his employment had been terminated because of his "reluctance and unwillingness to aid and abet the Spreen group in facilitating its illegal payment-packing scheme."

---

[1] Velau testified that he told Casella to make sure the SouthWest logo did not appear on the reports because they were the Spreen dealerships' "internal reports." He further testified, "I was playing on the side of caution that if [Casella's] guess happened to be correct, that we shouldn't be associated with it."

In April 2004, Casella filed a second amended verified complaint, which is the operative complaint in this action, alleging claims for fraud and violation of Labor Code section 970[2] against defendants and wrongful termination in violation of public policy against SouthWest only. The second amended verified complaint alleged Casella's employment was terminated because he reported his belief that SouthWest was participating in certain of its clients' illegal payment-packing schemes. The second amended verified complaint alleged SouthWest's conduct was illegal, citing several state and federal statutes. It also alleged defendants fraudulently concealed the fact Casella would be required to participate in unlawful activities to maintain employment with SouthWest, in order to induce him to come to work for SouthWest.

The trial court overruled defendants' demurrer challenging the claims in the second amended verified complaint, stating, "in prior complaints, the plaintiff did not identify the specific statutory authority for violations. That has been corrected. Plaintiff now pleads that the various statutes were violated by the clients and that he was compelled, illegally, to facilitate"; and "[t]he [second] cause of action for fraud states sufficient facts. It states the material facts concealed, who said what and when. Overruled." SouthWest filed a cross-complaint against Casella for breach of the parties' employment agreement and for misappropriation of trade secrets in violation of both statute and common law.

The trial court denied defendants' motion for summary adjudication in which they argued, inter alia, "there is no admissible evidence of an illegal practice" or that "SouthWest engaged or aided and abetted an illegal practice." The trial court stated, "[t]here is a triable issue of material fact as to whether the Spreen Group reports analyze and track 'payment packing[,'] and whether SouthWest had any knowledge of any 'payment packing[.']"

In September 2004, SouthWest voluntarily requested that the clerk of the court dismiss without prejudice its misappropriation of trade secrets claims contained in the cross-complaint; dismissal of those claims was entered accordingly.

---

[2] Labor Code section 970 provides: "No person, or agent or officer thereof, directly or indirectly, shall influence, persuade, or engage any person to change from one place to another in this State or from any place outside to any place within the State, or from any place within the State to any place outside, for the purpose of working in any branch of labor, through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning either: [¶] (a) The kind, character, or existence of such work; [¶] (b) The length of time such work will last, or the compensation therefor; [¶] (c) The sanitary or housing conditions relating to or surrounding the work; [¶] (d) The existence or nonexistence of any strike, lockout, or other labor dispute affecting it and pending between the proposed employer and the persons then or last engaged in the performance of the labor for which the employee is sought."

After 23 days of trial, including 19 days of testimony, the jury returned its special verdict in favor of Casella, awarding him the following: (1) $224,003 for wrongful termination in violation of public policy; (2) $10,000 for fraud; and (3) $6,000 for violation of Labor Code section 970. The jury, finding malice, oppression or fraud, awarded Casella $240,000 in punitive damages. The jury found for Casella as to the remaining claim for breach of the parties' employment agreement contained in SouthWest's cross-complaint.

The special verdict form asked the jury various questions. With regard to Casella's wrongful termination in violation of public policy claim, the jury found (1) Casella had a reasonably based suspicion that "Southwest and/or the Spreen dealerships were engaged in fraudulent activities"; (2) Casella's reporting of his reasonably based suspicion was a motivating reason for SouthWest's decision to discharge Casella; and (3) Casella was harmed as a result.

As to Casella's fraud claim, the jury found (1) Casella proved "Southwest and/or the Spreen dealerships were engaged in fraudulent activities"; (2) at the time Casella was offered the position with SouthWest, Hamann knew and failed to disclose to Casella that one of his job responsibilities would be to aid and abet the Spreen dealerships in fraudulent activities; (3) SouthWest actually required Casella "to aid and abet the Spreen dealerships in fraudulent activities"; and (4) Casella was damaged as a result of Hamann's failure to disclose that a condition of Casella's employment would include aiding and abetting the Spreen dealerships in fraudulent activities.

Finally, with regard to Casella's claim for fraudulent inducement in violation of Labor Code section 970, the jury found (1) SouthWest influenced Casella to move from New York to California for the purpose of working at SouthWest by knowingly failing to disclose that a condition of Casella's employment would include his participation in aiding and abetting the Spreen dealerships and/or SouthWest in fraudulent activities, and (2) Casella was damaged as a result.[3]

The trial court denied defendants' motion for JNOV and motion for a new trial, and awarded Casella $12,500 in reasonable attorney fees for prevailing on the cross-complaint pursuant to a prevailing-party attorney fees provision contained in Casella's employment agreement with SouthWest.

---

[3] The jury also answered interrogatories relevant if the trial court concluded the after-acquired-evidence doctrine applied. After the parties submitted further briefing on its applicability, the trial court concluded that the after-acquired-evidence doctrine did not apply based on the facts of this case. The parties have not challenged the trial court's determination on this issue in this appeal.

Judgment was entered on January 9, 2006. An amended judgment was entered on February 6, 2006, pursuant to the parties' stipulation regarding an undisputed error in the original judgment. Casella and defendants filed notices of appeal.

## DISCUSSION

### I.

#### REQUESTS FOR JUDICIAL NOTICE

Defendants filed two requests for judicial notice during the pendency of this appeal. The first requested, pursuant to Evidence Code sections 459 and 452, subdivision (c), that this court take judicial notice of records of the California Legislature pertaining to (1) Senate Bill No. 1721 (2003–2004 Reg. Sess.), which addressed payment packing, but was not passed; (2) Assembly Bill No. 1839 (2003–2004 Reg. Sess.), which similarly addressed payment packing, but was vetoed by the Governor; and (3) Assembly Bill No. 68 (2005–2006 Reg. Sess.), which was passed and signed by the Governor in 2005, and effectively "outlaw[ed] 'payment packing.' "

In their second request for judicial notice, defendants requested, pursuant to Evidence Code sections 459 and 452, subdivision (h), that this court take judicial notice of an article, issued on June 29, 2006, by the California Department of Motor Vehicles, regarding the passage of Assembly Bill No. 68 (2005–2006 Reg. Sess.) and the new written disclosure requirements the new law imposed on car dealers.

Casella has not filed an opposition to either of defendants' requests. Evidence Code section 459, subdivision (a) provides, in part, "[t]he reviewing court may take judicial notice of any matter specified in Section 452." Section 452, subdivision (c) provides that judicial notice may be taken of "[o]fficial acts of the legislative, executive, and judicial departments." Defendants' requests for judicial notice of the legislative history documents and the article by the California Department of Motor Vehicles are granted. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 279, fn. 9 [46 Cal.Rptr.3d 638, 139 P.3d 30] ["The legislative history in this case is relatively brief and our citation to it is limited to various versions of the legislation and committee reports, all of which are indisputably proper subjects of judicial notice"]; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 842, fn. 3 [107 Cal.Rptr.2d 841, 24 P.3d 493] [judicial notice of Attorney General's report on gasoline pricing proper as an official act of executive department].)

## II.

### DEFENDANTS' ISSUES ON APPEAL

#### A.

##### *Casella's Wrongful Termination in Violation of Public Policy Claim Was Properly Tethered to Penal Code Section 487 Proscribing Theft.*

###### 1. *Summary of defendants' contentions and our analysis.*

Casella's wrongful termination in violation of public policy claim was based on the allegation his employment was wrongfully terminated because he complained to Hamann about SouthWest's participation in what Casella referred to as a payment-packing scheme. Defendants contend that although legislation, which addresses the fraudulent conduct at issue in this case and imposes on car dealers new disclosure requirements, was passed *after* the trial in this case, payment packing was not against the law at the time Casella's employment was terminated. Therefore, defendants contend, Casella's claim fails because the public policy at issue was not tethered to a constitutional or statutory provision.

As discussed in detail *post*, in determining whether Casella's claim is based on a public policy tethered to a constitutional or statutory provision, we focus not on the label attached to the alleged wrongful conduct, for example, payment packing, but on the conduct itself in question. Here, evidence at trial showed Casella complained to Hamann that the Spreen dealerships were engaged in a practice of misrepresenting to the customer the calculated monthly payment that he or she would pay in a deal. The customer would be quoted an inflated monthly payment amount which would assist the finance and insurance managers in presenting and selling aftermarket products based on artificially low, false numbers. This conduct, as found true by the jury, certainly falls within the prohibition of Penal Code section 487 which proscribes making false or fraudulent representation or pretense to defraud another of money. The public policy underlying Casella's claim, therefore, is sufficiently tethered to statutory authority.

###### 2. *General legal principles governing the scope of the wrongful termination in violation of public policy claim.*

"[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an

unlawful reason or a purpose that contravenes fundamental public policy. Any other conclusion would sanction lawlessness, which courts by their very nature are bound to oppose." (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1094 [4 Cal.Rptr.2d 874, 824 P.2d 680], overruled on another ground in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) In *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 [164 Cal.Rptr. 839, 610 P.2d 1330], the California Supreme Court held that "at-will employees may recover tort damages from their employers if they can show they were discharged in contravention of fundamental public policy." (*Green v. Ralee Engineering Co., supra,* 19 Cal.4th at p. 71.)

■ In *Gantt v. Sentry Insurance, supra,* 1 Cal.4th 1083, the Supreme Court described "four categories of employee conduct subject to protection under a claim of wrongful discharge in violation of fundamental public policy: '(1) refusing to violate a statute [citations]; (2) performing a statutory obligation [citation]; (3) exercising a statutory right or privilege [citation]; and (4) reporting an alleged violation of a statute of public importance [citations].' " (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889 [66 Cal.Rptr.2d 888, 941 P.2d 1157].) The Supreme Court cautioned that "courts in *wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law." (*Gantt v. Sentry Insurance, supra,* 1 Cal.4th at p. 1095; see *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at p. 71 ["aside from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state"]; *Stevenson v. Superior Court, supra,* 16 Cal.4th at p. 889 ["tethering public policy to specific constitutional or statutory provisions serves not only to avoid judicial interference with the legislative domain, but also to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge"].)

■ With regard to the requisite policy underlying a wrongful termination in violation of public policy claim, the Supreme Court "established a set of requirements that a policy must satisfy to support a tortious discharge claim. First, the policy must be supported by either constitutional or statutory provisions. Second, the policy must be 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the

discharge. Fourth, the policy must be 'fundamental' and 'substantial.' " (*Stevenson v. Superior Court, supra*, 16 Cal.4th at pp. 889–890.)

"Whether the policy upon which a wrongful termination claim is based is sufficiently fundamental, well-established and tethered to a statutory or constitutional provision to support liability is a legal question that we review de novo." (*Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922, 929 [56 Cal.Rptr.3d 262].)

### 3. *Casella's wrongful termination in violation of public policy claim is tethered to Penal Code section 487.*

The special verdict form required the jury to determine whether Casella had a reasonably based suspicion that SouthWest and/or the Spreen dealerships were engaged in "fraudulent activities" and whether Casella's reporting of his reasonably based suspicion was a motivating reason for SouthWest's decision to terminate his employment.[4] The term "fraudulent activities" was defined for the jury based on Penal Code section 487 and its then corresponding jury instruction, CALJIC No. 14.05, as follows: "Every person who knowingly and designedly by any false or fraudulent representation or pretense, defrauds another person of money, is guilty of the crime of theft by false pretense. [¶] In order to prove this crime, each of the following elements must be proved: [¶] (1) A person made or caused to be made to the alleged victim by word or conduct, either (1) a promise without intent to perform it, or (2) a false pretense or representation of an existing or past fact known to the person to be false or made recklessly and without information which would justify a reasonable belief in its truth; [¶] (2) The person made the pretense, representation or promise with the specific intent to defraud; [¶] (3) The pretense, representation or promise was believed and relied upon by the alleged victim and was material in inducing [him] [her] to part with [his] [her] money or property even though the false pretense, representation or promise was not the sole cause; and [¶] (4) The theft was accomplished in that the alleged victim parted with [his] [her] money or property intending to transfer ownership thereof."

The jury was also instructed on aiding and abetting, as follows: "A person aids and abets the commission of a crime when he or she: [¶] (1) With

---

[4] The jury was instructed with a modified version of Judicial Council of California Civil Jury Instructions (2006) CACI No. 2430 which stated that in order to establish wrongful termination in violation of public policy, Casella had to prove (1) he was employed by SouthWest; (2) SouthWest terminated Casella's employment; (3) Casella had a reasonably based suspicion that SouthWest and/or the Spreen dealerships were engaged in fraudulent activities; (4) the reporting by Casella of his reasonably based suspicion that SouthWest and/or the Spreen dealerships were engaged in fraudulent activities was a motivating reason for Casella's discharge; and (5) the discharge caused Casella harm.

knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

The record therefore shows that Casella's wrongful termination in violation of public policy claim, as presented to the jury, was premised on the theory that he reasonably suspected SouthWest was committing or was aiding and abetting the commission of fraudulent activities proscribed by Penal Code section 487. Thus, contrary to defendants' assertions, the policy underlying Casella's claim was indeed tethered to a statute.

This case is similar to *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623 [17 Cal.Rptr.3d 336] (*Haney*). In *Haney*, the employer was engaged in the business of providing rental services. (*Id.* at p. 629.) The employee, who worked for the employer as a route sales representative, alleged that the employer "used a number of techniques that resulted in its customers paying for products or services that they did not receive and that these billing practices were fraudulent." (*Id.* at p. 630.) The employee alleged his employment was terminated after he objected to the employer's "practice of overcharging and misleading customers, and he refused to follow [the employer]'s practice of defrauding them." (*Id.* at pp. 641–642.) The employee sued the employer for wrongful termination in violation of public policy referring to, inter alia, Penal Code section 484 defining theft. (121 Cal.App.4th at pp. 631, 642.)

The employer in *Haney* moved for summary adjudication arguing, inter alia, that the employee's wrongful termination in violation of public policy cause of action "did not assert an appropriate public policy to support the claim." (*Haney, supra,* 121 Cal.App.4th at p. 631.) The appellate court reversed summary judgment granted in favor of the employer, stating, "[i]n light of *Tameny* [*v. Atlantic Richfield Co., supra,* 27 Cal.3d 167] and the fact that theft through fraudulent representation or pretense has long been defined as a crime by statute in California, we conclude that when an employer discharges an employee who refuses to defraud a customer, the employer has violated a fundamental public policy and may be liable in tort for wrongful discharge." (*Haney,* at p. 643.) The *Haney* court further stated, "[the employee]'s allegations that he was terminated for complaining about and refusing to engage in fraudulent billing practices are sufficient to state a claim for retaliatory discharge in violation of a public policy." (*Ibid.*)

Defendants contend Casella's wrongful termination in violation of public policy claim should fail because the conduct Casella described constituted payment packing and the Legislature, despite two earlier attempts, did not pass legislation proscribing payment-packing practices until after trial in this case. Thus, defendants argue: "If Penal Code Section 487 constituted a well articulated policy against payment packing, such that it put auto dealers and SouthWest on notice exactly what conduct was against the law, there would be no need for Senate Bill 1721 [which was not passed], Assembly Bill 1839 [vetoed by the Governor] or Assembly Bill 68, each [of] which would certainly constitute a well articulated public policy. The fact that the California Legislature was trying to enact statutes expressing public policy makes it clear that such statutes did not exist when Casella was hired or terminated, and that Penal Code Section 487 was inapplicable to this case."

█ Defendants' argument hinges on a demonstrably false premise— namely, that conduct which falls within a new criminal statute must have been permissible under already existing criminal statutes. "The same criminal act may violate more than one statute, and, if they are not inconsistent, either or both may normally be given effect, subject to the protections against double jeopardy and double punishment." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 59, p. 103; see *People v. Gilbert* (1969) 1 Cal.3d 475, 479 [82 Cal.Rptr. 724, 462 P.2d 580] [discussing interplay between general and specific statutes which " 'include the same matter' "].) Penal Code section 654, subdivision (a) specifically addresses the occasion where one act might violate more than one criminal statute, stating in part, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment."

In *Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1480 [16 Cal.Rptr.2d 888], the appellate court noted that although a claim for wrongful termination in violation of public policy requires "a constitutional or statutory provision [which] sufficiently describe[s] the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law," it is not required that the constitutional or statutory provision prohibit the precise act of the employer (e.g., discharging an employee for refusing to commit a crime). Here, SouthWest was on notice of the long-established policies prohibiting theft by misrepresentation to customers as proscribed by Penal Code section 487. The viability of Casella's claim did not depend on the existence of another statute specifically proscribing car dealers from secretly inflating monthly payment quotes to customers.

As defendants argue, some evidence shows the term "payment packing" has not had a precise definition. Velau testified that "there are many, many

ways that [payment packing] could be defined, depending on the person you are talking to, depending on the action that is happening," and further stated that while some conduct described as payment packing might constitute misquoting monthly payments and otherwise failing to disclose terms, in other circumstances, the term also might be used to describe circumstances where "everything has been quoted to the customer, everything has been disclosed." Hamann testified, "[p]ayment packing is a vague term, I have said that a million times."

But this alleged lack of exact definition of payment packing does not materially aid defendants' case. Indeed, the term "payment packing" is not used in the statutes effected by the passage of Assembly Bill No. 68 (2005–2006 Reg. Sess.). Rather the bill focuses on the improper conduct, as we have done. The Legislative Counsel's Digest of Assembly Bill No. 68 states, "[t]he bill would also prohibit a dealer from adding charges to a sale or lease contract without the buyer's consent or inflating a payment or extending the maturity of a contract for the purpose of disguising the actual charges for goods or services." (Legis. Counsel's Dig., Assem. Bill No. 68 (2005–2006 Reg. Sess.) as approved July 26, 2005.)

Defendants suggest the trial court had concluded payment packing was not illegal, but improperly allowed Casella's wrongful termination in violation of public policy claim to go forward to protect the record in anticipation of a defense verdict. The record does not support defendants' suggestion. What the trial court stated was, "if this case goes to the jury, [CACI No.] 2430 [the instruction on wrongful termination in violation of public policy] is not going to have payment packing. Payment packing is not illegal. Payment packing— because we don't know what it is. You can't define it. We've had five definitions of it." The court further stated, "[i]f this case goes to a jury, and if it goes to the jury on 2430, *it's got to go on fraud and aiding and abetting.*" (Italics added.)

Casella's wrongful termination in violation of public policy claim is therefore sufficiently tethered to a statute.

### B.

*The Trial Court Did Not Err by Denying Defendants' JNOV*
*Motion on Casella's Fraud Claim and Claim for Violation*
*of Labor Code Section 970.*

We review the trial court's denial of defendants' JNOV motion to determine " 'whether there is evidence in the record of sufficient substance to support [the] verdict.' " (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d

892, 906–907 [215 Cal.Rptr. 679, 701 P.2d 826]; see *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 49 [37 Cal.Rptr.3d 221].) In so doing, we consider the evidence in the light most favorable to the prevailing party, and indulge in all legitimate and reasonable inferences to uphold the verdict. (*Sanchez-Corea v. Bank of America, supra,* 38 Cal.3d at p. 907.) Even the uncorroborated testimony of a single witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

Although our review begins and ends with a determination that there exists substantial evidence to support the verdict, "this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].) Substantial evidence is not synonymous with " ' "any" evidence.' " (*Ibid.*) To be substantial, the evidence must be credible and of solid value. (*Ibid.*) "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (*Ibid.*)

Defendants contend the trial court should have granted their motion for JNOV on Casella's claims for fraud and for violation of Labor Code section 970. The jury was instructed on Casella's second cause of action for fraud as follows: "CASELLA claims that he was harmed because SOUTHWEST and HAMANN concealed certain information. To establish this claim, CASELLA must prove all of the following: [¶] 1. That SOUTHWEST and HAMANN intentionally failed to disclose an important fact that was known only to them and that CASELLA could not have discovered; [¶] 2. That CASELLA did not know of the concealed fact; [¶] 3. That SOUTHWEST and HAMANN intended to deceive CASELLA by concealing the fact; [¶] 4. That CASELLA reasonably relied on SOUTHWEST and HAMANN's deception; [¶] 5. That CASELLA was harmed; and [¶] 6. That SOUTHWEST and HAMANN's concealment was a substantial factor in causing CASELLA's harm."

The jury was instructed on Casella's claim for violation of Labor Code section 970 as follows: "Casella claims that SOUTHWEST and HAMANN made false representations about work to persuade him to change his residence. To establish this claim, CASELLA must prove all of the following: [¶] 1. That SOUTHWEST and HAMANN concealed the kind and character of work from CASELLA; [¶] 2. That SOUTHWEST and HAMANN's representations were not true; [¶] 3. That SOUTHWEST and HAMANN knew when the representations were made that [they] were not true; [¶] 4. That SOUTHWEST and HAMANN intended that CASELLA rely on the representations; [¶] 5. That CASELLA reasonably relied on SOUTHWEST

and HAMANN's representations and changed his residence for the purpose of working for SOUTHWEST and HAMANN; [¶] 6. That CASELLA was harmed; and [¶] 7. That CASELLA's reliance on SOUTHWEST and HAMANN's representations was a substantial factor in causing their harm."

Defendants' challenge to the trial court's denial of their JNOV motion with regard to these two claims is limited to two arguments. First, defendants contend, "the conduct that Casella alleged he was required to participate in was not illegal at that time." As discussed *ante*, the jury found that SouthWest required Casella to aid and abet the Spreen dealerships in fraudulent activities as defined in Penal Code section 487.

The following substantial evidence supported that finding: (1) Casella's job responsibilities at SouthWest included generating certain reports for the Spreen dealerships and distributing them at sales managers meetings; (2) one of the columns in the reports was labeled "P.A." which stood for "payment assistance" or "leg"; (3) leg constituted the amount by which the sales representative or sales manager overestimated the monthly payment that would be owed based on the sale terms agreed to by a customer; (4) the finance and insurance manager used leg to sell extra products to the customer at attractive (but artificially low) prices; (5) the customer was not informed that leg had been built into the deal; (6) in January 2003, Casella informed Hamann about the reports he was required to generate and distribute at sales managers meetings at the Spreen dealerships and how they assisted the Spreen dealerships by tracking the amount of leg the sales staff was giving the finance and insurance managers to sell customers aftermarket products; (7) Casella told Hamann about the "P.A." column in the reports, and how Casella totaled up the "P.A." numbers and put together percentages; (8) Casella informed Hamann that he then distributed copies of the reports at the sales managers meetings; (9) Casella told Hamann that he thought "we are doing something that we ought not be doing and we are taking some chances that we ought not be taking"; (10) Casella told Hamann what he told Velau, which included that he thought the practice of reporting leg was "crossing the line"; and (11) Hamann did not appear concerned and told Casella to call "P.A." or "payment assistance" rate spread profit if it would make him feel better.

Defendants also contend the trial court should have granted their JNOV motion as to the fraud claim and the violation of Labor Code section 970 claim on the ground "the undisputed and uncontradicted evidence at trial was that Hamann, who hired Casella, did not know that Casella would be assigned to Spreen until after Casella was hired" and "it was impossible that Hamann knew when hiring Casella that Casella would be required to service the Spreen account and participate in any alleged fraudulent and/or illegal activity which forms the basis for his fraud cause of action."

Defendants have waived this argument by failing to offer a single citation to the record in its support. Even if the argument had not been waived, substantial evidence supported the jury's reasonable inference that at the time Casella was hired by SouthWest in November 2002, Hamann knew Casella would be replacing Glass and very likely assuming responsibility for the Spreen dealerships, and for generating and distributing finance and insurance managers reports and sales managers reports tracking leg. Casella testified that when he spoke to Hamann in January 2003 about his concerns with tracking the Spreen dealerships' practice of building leg into deals, a practice Casella suspected was illegal, Hamann did not appear to be concerned and suggested Casella change the name of the "P.A." column to rate spread profit if it would make him feel better. In any event, defendants do not contend substantial evidence failed to support the implied finding Hamann was aware of the Spreen dealerships' fraudulent activities and SouthWest's representatives' involvement in those activities at the time he hired Casella.

The trial court did not err by denying defendants' motion for JNOV.

C.

*Defendants' Contentions of Error Regarding the Trial Court's Evidentiary Rulings.*

In shotgun fashion, and often with little analysis or citation to legal authority, defendants assert a litany of contentions the trial court prejudicially erred by improperly admitting certain testimony at trial. We review each contention of error, in turn, for abuse of discretion. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802].) We further review whether any such errors were prejudicial in that they "resulted in a miscarriage of justice" within the meaning of Evidence Code section 353.[5] (*O'Hearn v. Hillcrest Gym & Fitness Center, Inc.* (2004) 115 Cal.App.4th 491, 500 [9 Cal.Rptr.3d 342] ["In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is *reasonably probable* that a result more favorable to the appealing party would have been reached in the absence of the error"].)

---

[5] Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

Before we review each of defendants' contentions of evidentiary error, we address defendants' general argument, applicable to several of their individual contentions of evidentiary error, that the trial court erroneously admitted evidence of out-of-court statements on the ground they were not offered to prove the truth of the matter asserted, but to prove Casella's state of mind. (See Evid. Code, § 1200, subd. (a).) In the opening brief, defendants argue Casella's state of mind "was not probative of any material fact at issue in this case," and thus the admission of evidence on this basis was improper. Here, however, Casella's state of mind was not only relevant, it was an element of his claim for wrongful termination in violation of public policy. The jury was specifically instructed to find whether Casella had a reasonably based suspicion that SouthWest and/or the Spreen dealerships were engaged in fraudulent activities. Defendants' general argument, therefore, is without merit.

### 1. Casella's testimony regarding a conversation in which Tom Lawson admitted payment-packing practices.

Defendants contend the trial court erroneously admitted Casella's testimony describing a conversation Casella had with Tom Lawson, the general sales manager at Beach Cities Chevrolet, an AutoNation dealership. Casella testified that based on his conversation with Lawson, he understood "the way it worked [at Beach Cities Chevrolet], they simply quote—they simply quoted the customer a payment and in that payment it included the leg, an additional amount that the finance managers would then use in the same way that they were doing it at Spreen once the customer came in to finance."

Defendants argue the trial court erred by admitting Casella's testimony on this point, arguing that the court "permitted the admission of seemingly every item of hearsay proffered by Casella, including items for which the Court had previously granted motions *in limine* to exclude the same evidence, under the non-existent 'my understanding exception' to the hearsay rule." A review of the record shows the trial court permitted Casella's testimony to show his state of mind, which was probative of the issue whether he had a reasonably based suspicion that SouthWest was engaged in fraudulent activities, and did not abuse its discretion in doing so.

Suggesting inconsistent rulings by the trial court in favor of Casella, defendants contend, "[w]hen Hamann was asked about his own conversation with Lawson after the lawsuit was filed and his understanding of what really had occurred based on his conversation with Lawson, [the trial court] sustained Casella's hearsay objection." In support of this argument, defendants cite a portion of the record which shows the trial court sustaining *defendants'* hearsay and lack of foundation objections to Casella's counsel's questions during his cross-examination of Hamann.

Defendants also cite to a portion of the record showing defendants' counsel's redirect examination of Hamann where the trial court granted Casella's motion to strike Hamann's testimony about talking to Lawson, on hearsay grounds. Hamann then testified, "[b]ased on what I know, they never had the conversation as [Casella] recalls it"; Casella's counsel did not object. Hamann testified about what Lawson told him Lawson said to Casella. This testimony was offered for the truth of what Lawson told Hamann happened during his conversation with Casella and thus was properly excluded as inadmissible hearsay. In any event, defendants have failed to show they suffered any prejudice by the ruling.

### 2. Casella's testimony regarding his conversation with Lorna Metzger during which she admitted payment-packing practices.

Defendants contend the trial court abused its discretion by admitting Casella's testimony regarding a conversation he had with finance manager Lorna Metzger, during which she told him Long Beach Nissan (another of SouthWest's clients) engaged in a form of payment packing. This testimony was offered to prove Casella's state of mind and, specifically, his reasonably based suspicion SouthWest was involved in fraudulent activities; the trial court admonished the jury accordingly. Casella testified as follows:

"Q [By Casella's counsel] All right. Did you also go to Long Beach Nissan and make an inquiry of this type?

"A At Long Beach Nissan I didn't make an inquiry at that particular dealership about that, but I remember being asked to train one of the finance managers on how to increase her back-end average or her sales because her sales were not up to par according to the general manager.

"Q Okay. And what was your understanding of what that undertaking was to involve?

"[Defendants' counsel]: Objection. Hearsay. [Evidence Code section] 352. Irrelevant.

"The Court: Overruled.

"The witness: My understanding was I was to sit down with this particular finance manager and help her increase her, the income that she was generating on the back end of the deals that she was getting.

"Q By [Casella's counsel]: Now, did you have a conversation with her during the course of this inquiry?

"A Yes, I mean, the finance manager that I am referring to was a woman and her name was Lorna Metzger.

"Q I don't want you to tell the jury what she said, but what was your understanding of what she was doing?

"[Defendants' counsel]: Objection. Hearsay. [Evidence Code section] 352. No foundation. Irrelevant.

"The Court: The objection is overruled, but I'm going to admonish the jury, [Casella's counsel]. [¶] Ladies and gentlemen, I am permitting you to hear the testimony of his mental impression of what was told to him, not for the truth of what was told to him, which is hearsay, but for the impression it made upon him and whether he had a reasonably based suspicion that there was illegal activity. All right. It is a subtle distinction but you must understand that difference. [¶] Go ahead.

"[Casella's counsel]: Thank you, your honor.

"The witness: I'm sorry, I'm lost a little bit.

"Q By [Casella's counsel]: Yes. Based on what she told you, not what she said, what was your understanding of what she was doing to sell the products?

"A My understanding was she was offering customers two payments, one at a particular interest rate, say $450 with absolutely no back-end products, and the same $450 a month payment with a lower interest rate and additional products. So essentially my understanding was she was offering the customer either you can have this $400, $450 a month payment with an alarm and all these nifty gadgets for a lower interest rate or you can have this for—you can have this car for $450 a month, you are not going to get any of these additional benefits and your interest rate is going to be higher."

The trial court did not abuse its discretion by admitting this testimony in light of the court's limiting instruction.

### 3. *Casella's testimony regarding Tony Craig's hearsay conversation.*

Defendants argue the trial court abused its discretion by permitting Casella to testify about his conversation with Tony Craig who, according to Hamann, had complained about Casella. But the trial court sustained defendants' objection to this testimony.

Casella testified, "So I think later that day I actually went down to Long Beach Nissan and I talked to Tony Craig the general manager and we went into an office, one on one, and I said, hey, Tony, this is what happened. I said, I can't believe they let me go and they fired me. And you know, [Hamann] told me it was because Emil[6] complained, but then I asked Emil and I called Emil and he said it wasn't, he didn't have a problem with me. So I don't really know what's going on here. And Tony just sat and listened.

"[Defendants' counsel]: Objection. Hearsay.

"The Court: Objection sustained. Next question, please.

"Q By [Casella's counsel]: What was your understanding of the conversation?

"[Defendants' counsel]: Objection. Hearsay. This is Tony Craig who hasn't testified yet.

"The Court: Overruled."

Although not cited by defendants in the opening brief, Casella then went on to testify that his understanding "was that Tony thought that he suggested that it was just these things happen in the business." The court then interrupted, "[n]o, no, no. Objection sustained. Answer stricken."

No admonishment was requested. Defendants do not argue that they were prejudiced by this testimony in light of the fact the trial court sustained their objection and struck Casella's testimony on this point. The trial court did not abuse its discretion.

### 4. *Casella's testimony regarding his understanding of defendants' strategy in taking depositions.*

Defendants' entire argument challenging Casella's testimony regarding defendants' deposition strategy consists of the following: "Overruling Defendants' hearsay objections, [the trial court] permitted Casella to testify about his 'understanding' of Defendants' counsel's strategy as to who[m] to depose from Casella's former employer as well as the information being sought. The Court permitted Casella to testify about his 'understanding' of the deposition testimony of his former Toyota co-workers."

---

[6] Emil Cain was the finance director of Long Beach Nissan from November 2002 until April 2003.

We do not need to decide whether the trial court abused its discretion by allowing such testimony because defendants have not made any argument about how they were prejudiced.

### 5. *David Stivers's testimony regarding his understanding of deposition testimony.*

With regard to the testimony of Casella's expert witness, David Stivers, defendants argue, "[o]verruling Defendants' hearsay objections, [the trial court] permitted Stivers to functionally read hearsay deposition testimony into the record, referencing page and line citations, by qualifying his statements as this is my understanding of what is being stated." Defendants further argue the trial court "disregarded every precedent in California that an expert can rely on inadmissible evidence but cannot introduce the inadmissible evidence."

Without discussing any specific objectionable testimony and without any analysis, defendants broadly draw the conclusion Stivers's testimony "was prejudicial because Stivers read and editorialized/interpreted the deposition testimony of witnesses before they had testified at trial. Thus, before the witnesses testified, he had already cast witnesses as liars and published clearly inadmissible out[-]of[-]court statements."

Defendants neither cite anywhere in the record where Stivers cast witnesses as liars, nor provide any other analysis regarding this issue. Even if the admission of Stivers's testimony on this point constituted an abuse of discretion, defendants have failed to carry their burden of showing how they were prejudiced by it.

### 6. *Casella's testimony about defendants' pretrial evidence-exclusion motions and the trial court's rulings on such motions.*

Defendants further contend, "[p]erhaps the most egregious error of all, [Casella's counsel] was permitted by the Court, over objections, to examine witnesses on pre-trial exclusion and injunctive motions. The Court even permitted Casella's counsel to state in his leading questions, and then permitted Casella to testify about his 'understanding[,'] of how the Court had ruled on pre-trial motions. The Court then permitted [Casella's counsel] to cross-examine Hamann on the motions, SouthWest's motives for filing the motions, and the Court's rulings . . . . [Casella's counsel] then repeatedly argued to the jury that Defendants tried to keep evidence from the jury. [¶] The erroneous admission of evidence was extremely prejudicial in that it

screamed 'Defendants are trying to keep prejudicial evidence from the jury!' "

In asserting their argument, defendants have failed to discuss the nature of the objections asserted against this testimony, discuss the substance of the testimony regarding pretrial evidence-exclusion and injunction motions, cite any legal authority barring such testimony, or discuss in any meaningful way how defendants were prejudiced by this testimony. We find no prejudicial error.

### 7. Casella's testimony regarding the anatomy of the Spreen dealerships' documents.

Defendants further contend, "[a]fter granting Defendants' Motion *in Limine* No. 7 . . . to exclude the same, the Court, over Defendants' lack of foundation objections, permitted Casella to testify about 'his understanding' now of what every entry in Spreen's stolen internal documents means and what had occurred. . . . There was no foundation for Casella's testimony because there were so many necessary facts of which Casella had never been apprised."

Casella testified at length about being trained in generating the Spreen dealerships' reports, using data provided by the Spreen dealerships to generate the reports, and distributing the reports at the Spreen dealerships' sales managers meetings. Casella's understanding of the anatomy of such documents, and in particular the "P.A." and the "Percentage P.A." columns, was relevant to show his state of mind, and specifically, whether he had a reasonably based suspicion SouthWest and/or the Spreen dealerships were involved in fraudulent activities. Defendants were free to rigorously cross-examine Casella on his understanding of the documents as well as put on their own witnesses knowledgeable about such documents. Defendants have failed to establish the admission of such testimony constituted an abuse of discretion.

### 8. Stivers's expert testimony regarding automobile industry standards and the law.

Defendants contend, "[a]fter denying without prejudice Defendants Motion *in Limine* No. 19 (to exclude guidelines and standards) . . . and No. 17 (to exclude the testimony of Stivers on what is illegal) . . . , the Court permitted Stivers to testify on industry standards and the Truth in Lending Act. . . . No expert is permitted to testify about the law. [Citation.] Defendants were unduly prejudiced because industry standards and the Truth in Lending Act

were not relevant. [Citation.] The jury was told by Stivers, an expert, that payment packing violates specific laws, which was false."

Defendants cite to the record where Stivers testified, "[t]he standards of the industry indicate that although salespeople may occasionally answer questions about what they call ancillary products, add-on products, that the salesperson should not be including any of those products in the monthly payment that's quoted initially." Even if such testimony might be irrelevant, defendants fail to cite any legal authority supporting their argument that the trial court's allowance of Stivers's testimony on industry standards constituted a prejudicial abuse of discretion.

Stivers further testified that based on his analysis of the case, "the salespersons were sending in payments that included product" and based on his review of the documents, "the majority of the customers . . . were being quoted monthly payments by the salesperson that included added products in addition to the cost of the car." He did not testify that those salespersons violated the law. The trial court sustained defendants' objection to a question asking Stivers whether the federal Truth in Lending Act (15 U.S.C. § 1601 et seq.) was violated by the payment-packing practice of the Spreen dealerships.

In support of their argument, defendants also cite Stivers's testimony that the utilization of the "four square system" is a way for dealers "to distract the consumer away from the price of the vehicle and distract the consumer away from the agreed upon . . . trade-in allowance and redirect the consumer's attention from those cost proponents that many people are interested in when they come in to look for a car and switch their attention over to the monthly payment in the amount of cash that he or she is putting down on the transaction." Certainly the extent to which SouthWest's clients utilized this system is relevant to practices of defrauding customers in calculating monthly payments. Defendants have failed to show how this testimony fell outside the ambit of proper expert witness testimony.

### 9. George Brnilovich's testimony regarding why his employment with AutoNation was terminated.

George Brnilovich testified he had worked for AutoNation as the general manager for Corona Chevrolet and Corona Volkswagen. Brnilovich's employment was terminated the day before Casella's employment with SouthWest was terminated.

Defendants contend that "[o]ver SouthWest's hearsay, no foundation, irrelevant and Evidence Code [section] 352 objections, the Court permitted Brnilovich to testify about 'his understanding of the reason he was terminated' from Corona Chevrolet. Brnilovich was then permitted to testify about problems with a 'market vice-president[,'] problems within the finance departments at a lot of AutoNation stores, and that he reported that his own store had problems with payment packing to the market vice president, which he believed, but was never told, was the reason for his termination."

At trial, Brnilovich was asked, "[d]o you have an understanding as to why you were terminated on that date?" He testified as follows:

"A Was I given a reason?

"Q Yes, sir.

"A I was given a reason because [of] employee complaints.

"The Court: Because what?

"The witness: Employee complaints.

"Q By [Casella's counsel]: Employee complaints is what you were told why you were terminated on April the 2nd, 2003, correct?

"A Correct.

"Q Do you understand the term 'whistle blower'?

"A Yeah, everybody understands the term 'whistleblower.'

"Q Do you have an understanding as to whether or not you were terminated because you were a, quote, 'whistle blower,' end quote, on that date?

"A It sort of figures that way.

"Q Why?

"A Because I—

"[Defendants' counsel]: Objection. Hearsay. Irrelevant. [Evidence Code section] 352.

"The Court: Overruled.

"The witness: Because I reported the problems directly to a finance director, and we reported to a market vice-president, the employees were not terminated, I had a retro pay cut that same month and following month after that I was terminated.

"Q By [Casella's counsel]: You made some type of a report?

"A I made—

"Q To Mishel Jolly and to management of your company; is that correct?

"A That's correct.

"[Defendants' counsel]: Objection. Misstating and misstates prior testimony.

"The Court: Sustained. Rephrase the question.

"Q By [Casella's counsel]: Did you make some type of a report concerning your concerns about payment packing at the dealership which you believe resulted in your termination?

"[Defendants' counsel]: Objection. No foundation. Hearsay. Irrelevant. [Evidence Code section] 352.

"The Court: Sustained. Hearsay. No foundation.

"Q By [Casella's counsel]: What is your understanding of the true reason you were terminated?

"[Defendants' counsel]: Objection. Irrelevant.

"The Court: Overruled.

"[Defendants' counsel]: Objection. No foundation.

"The Court: Overruled.

"The witness: My understanding?

"Q By [Casella's counsel]: Why do you believe you were terminated?

"A Why I believe I was terminated?

"Q Yes, sir.

"A Because they had a lot of problems. They had problems with a market vice-president, had beg[u]n from my understanding a lot of problems within our finance departments that involved exactly what we are talking about here, which is a little bit of a payment packing or leg, whichever one you want to call it. And that it spread into a lot of stores. [¶] I was also given a reprimand in November which didn't allow me to communicate with my management people by the same individual."

In neither of their appellate briefs do defendants analyze why Brnilovich's testimony was improper except to recite the objections they asserted during trial. Brnilovich's testimony that his employment was terminated a day before Casella's termination, and after he had reported payment-packing practices going on at his dealership, is relevant to the issues in this case. Defendants do not analyze how any prejudicial impact might substantially outweigh its probative value pursuant to Evidence Code section 352. It is not clear what further foundation defendants suggest was needed before Brnilovich could offer his opinion on why his employment was terminated. Defendants did not assert an objection that Brnilovich's testimony constituted impermissible speculation.

Defendants have therefore failed to show the trial court abused its discretion by admitting Brnilovich's testimony.

### D.

### *Jury Instruction Error.*

Defendants argue the trial court prejudicially erred by refusing to instruct the jury with five of the custom jury instructions proposed by defendants, and by improperly instructing the jury on wrongful termination in violation of public policy. "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

#### 1. *Custom jury instruction No. 1.*

Citing *Mt. Healthy City Board of Ed. v. Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 97 S.Ct. 568], *Grant v. Hazelett Strip-Casting Corp.* (2d Cir.

1989) 880 F.2d 1564, 1568, and *Martori Brothers Distributors v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 729–730 [175 Cal.Rptr. 626, 631 P.2d 60], defendants argue that because "[t]here was substantial evidence of reasons that Casella was or would have been terminated other than for reporting payment packing," the trial court should have instructed the jury with custom jury instruction No. 1 which read: "If Casella establishes by a preponderance of the evidence that the reporting of his reasonably based suspicion of fraudulent activity was a motivating factor in SouthWest's decision to terminate Casella, the burden falls to SouthWest to prove by a preponderance of the evidence that it would have made the same decision even if it had not taken into account Casella's reporting of his reasonably based suspicion."

Defendants raised this issue in their motion for a new trial. In the trial court's order denying defendants' motion, the court stated, "[t]he Special Instruction requested by the Defendants based on *Martori* [*Brothers Distributors*] *v. Agricultural* [*Labor*] *Relations* [*Bd., supra,*] 29 Cal.3d 721 . . . is puzzling. The instruction was refused because it dealt with 'after-acquired' evidence which the Court determined was an equitable issue to be decided by the Court. It was therefore unnecessary to submit the proffered jury instruction for an equitable issue. There was no objection by either party."[7]

In their briefing on appeal, defendants completely ignore the trial court's explanation for refusing to give this jury instruction on that basis. Defendants have not challenged the trial court's handling of the after-acquired-evidence doctrine in this case. There was no error by the trial court.

### 2. *Custom jury instruction No. 6.*

Defendants contend the trial court erred by refusing to give custom jury instruction No. 6 defining the term "reasonably based suspicion" as follows:

---

[7] The trial court further noted, "[t]he special instruction cites a 2nd Circuit Court of Appeals Federal case from New York that supposedly cited *Martori* [*Brothers Distributors v. Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721] for authority. No such reference to *Martori* was found in that Federal case *Grant v. Haz[e]lett Strip-Casting* [*Corp., supra,*] 880 F.2d 1564, and there was no page 1548 in the opinion [see Defendants Custom Jury Instruction No. 1]. A *Shepard's* search of *Martori* failed to show that it was cited in *Grant*. Moreover, the *Martori* case holding was limited to an administrative law proceeding [Agricultural Relations Board]. The cases citing it as authority in *Shepard's* are administrative law cases. None provide it as authority for the purpose offered by Defendants." (Fifth & sixth brackets in original.) Not every case to cite *Martori* is an administrative law case. Otherwise, the trial court's description is accurate. Nevertheless, defendants have cited the same authority in their appellate briefs, without explanation.

"A 'reasonably based suspicion' requires specific, articulable facts which, together with objective and reasonable inferences form the basis for the person's suspicion. [¶] 'Objective' is defined as: of, relating to, or based on externally verifiable phenomena, as opposed to an individual's perceptions, feelings or intentions."

In denying defendants' motion for a new trial, the trial court stated, "Moving Party has failed to show that the jury could not understand or give the phrase 'reasonably based suspicion' its plain meaning. Defendants provided no authority that such an instruction was required. The proffered special instruction, a tortured definition of 'reasonably based suspicion[,]' appeared to the court to be confusing while the plain meaning of the words did not." We agree. The trial court did not err by refusing to instruct the jury with defendants' custom jury instruction No. 6.

### 3. *Custom jury instruction No. 9.*

Defendants contend the trial court erred by failing to give their proposed custom jury instruction No. 9 which stated: "The only person's state of mind that is relevant in a wrongful termination case is the person who actually made the decision to terminate the employee. Further, only information actually known by the person who made the decision to terminate the employee is relevant in determining whether the person acted in good faith."

The jury was instructed it could not find SouthWest liable for wrongful termination in violation of public policy unless it found true "the reporting by Casella of his reasonably based suspicion that SouthWest and/or the Spreen dealerships were engaged in fraudulent activities was a motivating reason for Casella's discharge." The jury could not find SouthWest liable for wrongful termination in violation of public policy as instructed, unless it first concluded the decision maker was motivated at least in part by the fact Casella reported fraudulent activities. Defendants' proposed instruction was superfluous. The trial court did not err by refusing to give it to the jury.

### 4. *Custom jury instructions Nos. 11 and 12.*

Defendants argue: "Custom Jury Instruction Nos. 11 and 12 were simply Custom Jury Instruction No. 6 broken up into two parts. One or both parts should have been given." The trial court did not err by refusing to give custom jury instructions Nos. 11 and 12 for the same reason it did not err by refusing to give custom jury instruction No. 6, as discussed, *ante.*

5. *The trial court properly instructed the jury on wrongful termination in violation of public policy and fraudulent activities.*

Defendants reiterate their arguments that the trial court erred by instructing the jury on fraudulent activities under Penal Code section 487 because that statute did not articulate a public policy against payment packing and the specific conduct Casella testified he reported to Hamann. Defendants' argument fails for the reasons discussed, *ante*, in part II.A.

Defendants also repeat their argument that "[t]here was no evidence at trial that Casella told Hamann that he suspected 'fraud.' " Therefore, they contend the trial court erroneously instructed the jury with CALJIC No. 14.05 renamed " 'Fraudulent Activities' " and a modified version of CACI No. 2430 regarding wrongful termination in violation of public policy which incorporated the term " 'fraudulent activities.' " The substantial evidence summarized in part II.B, *ante*, supporting the jury's finding Casella was required to aid and abet the Spreen dealerships in fraudulent activities also supported the jury's findings that Casella reasonably suspected SouthWest and/or the Spreen dealerships were engaged in fraudulent activities and that he reported his reasonably based suspicion.

E.

*The Trial Court Did Not Refuse to Weigh the Evidence or Consider the Entire Record in Ruling on Defendants' Motion for a New Trial.*

Finally, defendants argue the trial court erred by "refus[ing] to even consider the task of reweighing the evidence as requested by Defendants in their Motion for New Trial." Section 657 of the Code of Civil Procedure provides in relevant part: "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, *that the court or jury clearly should have reached a different verdict or decision.*" (Italics added.) Section 657 by its terms requires the trial court to weigh the evidence and consider the entire record. (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 413 [93 Cal.Rptr.2d 60, 993 P.2d 388].) The court is "vested with the authority . . . to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom

contrary to those of the trier of fact." (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315].)

Contrary to defendants' assertions, the trial court did not state it refused to weigh the evidence and determine from the entire record whether the jury "clearly should have reached a different verdict" as required by Code of Civil Procedure section 657. In the notice of ruling, the trial court only stated that it rejected defendants' request that the court determine the evidence insufficient as a matter of law. The record shows the trial court expressly and, in detail, found that "substantial evidence" supported the jury's special verdict and that the court did not conclude the jury "clearly should have reached a different verdict."

## III.

### CASELLA'S CROSS-APPEAL

Casella solely contends on cross-appeal that the trial court erred by failing to award him the full amount of reasonable attorney fees he incurred not only in defending against defendants' claims, but also in prosecuting his tort claims against defendants, pursuant to the mandatory prevailing-party attorney fees provision contained in his employment agreement with SouthWest. For the following reasons, we disagree.

Casella's employment agreement contained the following attorney fees provision: "If any legal action arises under this Agreement or by reason of any asserted breach of it, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorney's fees, incurred in enforcing or attempting to enforce any of the terms, covenants or conditions, including costs incurred prior to commencement of legal action, and all costs and expenses, including reasonable attorney's fees, incurred in any appeal from an action brought to enforce any of the terms, covenants or conditions."

After Casella prevailed on each of his claims asserted in the second amended verified complaint and successfully defended against defendants' cross-complaint, Casella filed a motion seeking to recover prevailing-party attorney fees pursuant to the attorney fees provision in the employment agreement. The trial court granted Casella prevailing-party attorney fees incurred in defending against the breach of contract claim asserted in the cross-complaint, but denied Casella prevailing-party attorney fees incurred in prosecuting his claims as contained in the second amended verified complaint. The trial court stated, "[t]he Motion by [Casella] for the Court to

Determine the Party Prevailing on Contract is Granted in part. Casella is the prevailing Party on the Cross-Complaint which contained a breach of contract cause of action and was based upon the employment contract between Casella and Defendant Southwest Dealer Services, Inc. The attorney fees for [Casella] for defending the Cross-Complaint for breach of contract are set at $12,500."

Casella contends the trial court interpreted the attorney fees provision too narrowly to only allow for recovery of prevailing-party attorney fees with regard to defendants' breach of contract claim asserted against him in the cross-complaint. He contends that in light of the language of the attorney fees provision, the trial court should have awarded him prevailing-party attorney fees incurred in the prosecution of his claims against defendants.[8]

. When the facts are not in dispute and the right to recover attorney fees depends upon the interpretation of a contract and no extrinsic evidence is offered to interpret the contract, we review the ruling de novo. (*Exxess Electronixx, supra*, 64 Cal.App.4th at p. 705.)

■ In *Santisas v. Goodin* (1998) 17 Cal.4th 599, 608 [71 Cal.Rptr.2d 830, 951 P.2d 399], the California Supreme Court held, " '[p]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract.' " In *Santisas*, the parties had entered a contract which allowed a prevailing party to recover attorney fees incurred in any action "arising out of the execution of the agreement." (*Id.* at p. 607.) The Supreme Court stated, "[i]f a contractual attorney fee provision is phrased broadly enough, as this one is, it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims . . . ." (*Id.* at p. 608; see *Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1344 [5 Cal.Rptr.2d 154] [the phrase " 'gives rise to' " in a prevailing-party attorney fees provision must be interpreted "in a far more general, transactional sense than is suggested by phrases such as 'derives from' or 'proximately caused by' "].)

In this case, the attorney fees provision starts out broadly, using the phrase "[i]f any legal action arises under this Agreement" similar to the language at issue in *Santisas v. Goodin, supra*, 17 Cal.4th at page 607. But, unlike the provision in *Santisas*, the provision then narrows in scope, limiting the recovery of reasonable attorney fees to those "incurred in *enforcing* or *attempting to enforce* any of the terms, covenants or conditions," including

---

[8] Defendants have not challenged the prevailing-party attorney fees awarded by the trial court in favor of Casella on the cross-complaint. In fact, defendants concede, "Casella was entitled to an award of his reasonable attorney's fees incurred to defend the cross-claim, which took only two to three hours at trial."

reasonable attorney fees "incurred in any appeal from an action brought *to enforce* any of the terms, covenants or conditions." (Italics added.)

■ Casella's second amended verified complaint solely contained claims for wrongful termination in violation of public policy, fraud, and violation of Labor Code section 970. Such tort claims do not seek to enforce the employment agreement. Section 1717, subdivision (a) of the Civil Code "makes clear that a tort claim does not 'enforce' a contract. That statute expressly refers to, and therefore governs, 'attorney's fees . . . which are incurred to enforce th[e] contract.' Because section 1717 does not encompass tort claims [citations], it follows that tort claims do not 'enforce' a contract." (*Exxess Electronixx, supra,* 64 Cal.App.4th at p. 709.)

Citing *Santisas v. Goodin, supra,* 17 Cal.4th 599, the appellate court in *Exxess Electronixx, supra,* 64 Cal.App.4th at page 709 stated, "[a]s our Supreme Court has indicated, where a lease authorizes an award of attorneys' fees in an action to ' " 'enforce any . . . provision . . . of this [contract],' " ' tort claims are not covered." (See *Xuereb v. Marcus & Millichap, Inc., supra,* 3 Cal.App.4th at pp. 1342–1343 [a party cannot recover attorney fees on tort claims under a contractual provision which authorizes fees incurred in an action to interpret or enforce the contract]; *McKenzie v. Kaiser-Aetna* (1976) 55 Cal.App.3d 84, 89 [127 Cal.Rptr. 275] ["an action for negligent misrepresentation is not an action to enforce the provisions of a contract"]; *DeMirjian v. Ideal Heating Corp.* (1949) 91 Cal.App.2d 905, 909–910 [206 P.2d 20] [lease provision authorizing attorney fees award in an action " 'to enforce Lessors' rights hereunder' " does not include tort claims].)

In *Exxess Electronixx, supra,* 64 Cal.App.4th 698, the appellate court held the trial court erred in awarding prevailing-party attorney fees for tort claims pursuant to a contractual provision permitting prevailing-party attorney fees in " 'an action or proceeding to enforce the terms [of the lease] or declare rights hereunder.' " (*Id.* at p. 702.) The appellate court stated, "[i]n short, the award of attorneys' fees cannot be sustained on the theory that the tort claims were brought to 'enforce the terms' of the lease." (*Id.* at p. 709.)

Here, as in *Exxess Electronixx, supra,* 64 Cal.App.4th 698, 709, the language of the prevailing-party attorney fees provision only provided for recovery of fees in actions brought to enforce the parties' agreement, and did not provide for the recovery of such fees in tort actions. Casella has not identified any other contractual provision or statute authorizing prevailing-party attorney fees which would support his recovery of prevailing-party attorney fees incurred in the prosecution of his tort claims against defendants. The trial court, therefore, did not err.

## DISPOSITION

The judgment is affirmed. In the interests of justice, as none of appellants prevailed on his or its respective claims, no party shall recover costs on appeal.

Moore, Acting P. J., and Aronson, J., concurred.