Filed 6/3/15  DMF Trucking v. Colmac Energy CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DMF TRUCKING, | D066969 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. INC10011063) |
| COLMAC ENERGY, INC. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment and orders of the Superior Court of Riverside County, Harold W. Hopp, Judge.  Affirmed in part and dismissed in part.

Graobaty & Pitet, Michael J. Grobaty, Christopher L. Pitet, Jacqueline A. Turner; Snell & Wilmer, Richard A. Derevan and Todd E. Lundell for Defendants and Appellants.

Law Office of Reginald E. Alberts, Reginald E. Alberts; Law office of Eric C. Alberts and Eric C. Alberts for Plaintiff and Appellant.

Defendants and Appellants Colmac Energy, Inc. and Paula Bates, at all times relevant an employee and the fuel manager of Colmac (sometimes collectively Colmac), appeal (1) a judgment in favor of plaintiff and appellant DMF Trucking (DMF) and (2) an order denying Colmac's motion for judgment notwithstanding the verdict (JNOV). DMF separately appeals the court's order partially granting Colmac's motion for new trial on damages only in connection with DMF's defamation cause of action.

From 1991 until June 2010, DMF coordinated deliveries of wood chips to Colmac's clean-energy plant located in Mecca, California. Colmac burned the wood chips to create electrical energy that it then sold to a third-party utility. DMF worked exclusively for Colmac. Over the 18 or so years DMF delivered wood chips to Colmac's plant, DMF's operations grew substantially. In 2010, when the instant action arose, about 30 or 40 drivers worked as independent contractors for DMF hauling wood chips to Colmac's plant. Some of those drivers had hauled for DMF for more than 15 years and several for more than a decade. The rate paid by Colmac for delivery of the wood chips depended on the weight of the wood chips, their quality and the distance between Colmac's plant and the various yards where the wood chips were picked up.

Of the millions of dollars Colmac paid DMF each year, DMF kept about 15 percent as earned "broker fees." DMF paid the remaining 85 percent or so to its drivers. DMF alone was responsible for screening, hiring, training, dispatching, disciplining, and paying its drivers.

The instant dispute arose in June 2010, after Colmac terminated the services contract of DMF as a result of DMF's alleged failure to pay the drivers the rates *Colmac* believed they should be paid under the party's long-term services contract. The same day

Colmac terminated the contract with DMF, Bates prepared a notice of termination and posted it in Colmac's "scale house" where it would be seen by the DMF drivers hauling wood chips, who came and went several times each day. The notice also provided that Colmac would be willing to pay the DMF drivers directly and that a meeting for DMF drivers would take place the next day, a Saturday, to answer any questions.

Every one of the drivers hauling for DMF attended the meeting arranged by Colmac. During the meeting, Bates told the drivers, "There was a discrepancy in the rates that DMF was paying" them. Bates also provided each driver with a "rate sheet" that showed the rates Colmac believed DMF should have been paying the drivers all along. Bates, on behalf of Colmac, promised the drivers that Colmac would pay them those higher rates going forward. Every one of DMF's drivers stopped working for DMF that same day and by the following Monday, every one of those drivers was hauling directly for Colmac.

DMF sued Colmac and Bates in late 2010 for defamation and interference with prospective economic relations, among other causes of action, after DMF was unable to hire drivers to fulfill other contracts between it and one or more third parties. The operative complaint alleged the statement by Bates to the DMF drivers about a "discrepancy" in what they were being paid by DMF was slanderous per se because the words, in context, charged DMF "with a crime, i.e., theft and/or embezzlement, and/or they directly injured DMF Trucking in respect to its profession, trade or business of brokering truck deliveries for and behalf of their sub-haulers for their and Colmac's mutual benefit."

3

As relevant here, the jury found that Bates's "discrepancy" statement constituted defamation per se. The jury awarded DMF $1.75 million in actual damages, including $400,000 for economic harm and $1.35 million for reputation harm. The jury also found by clear and convincing evidence that Bates, in the course and scope of her employment, acted with malice, oppression or fraud in making the statement and awarded DMF $100,000 in punitive damages. Further, the jury found Colmac interfered with the economic relationship between DMF and its drivers and awarded DMF $400,000 in damages and $100,000 in punitives.

Following the verdict, Colmac filed its JNOV and new trial motions. The court granted the JNOV motion with respect to the $100,000 punitive damages award against Bates individually but denied that motion in all other respects. As particularly relevant to this appeal, the court also conditionally granted Colmac's new trial motion with respect to the jury's award of defamation damages. The court, however, ruled it would deny the new trial motion if DMF accepted a remittitur of damages to $500,000 ($400,000 in economic harm and $100,000 in punitives). DMF refused.

During the pendency of this appeal, we requested supplemental briefing from the parties regarding our jurisdiction to consider, on the one hand, the appeal of Colmac to the judgment and to the order denying the JNOV, and on the other hand, the protective appeal of DMF to the order granting Colmac's new trial motion on the issue of defamation damages. (See, e.g., *Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 302 (*Keck*); *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 329 (*Beavers*).)

4

As we explain, because we affirm the court's order granting Colmac's new trial motion, we conclude we lack jurisdiction to consider Colmac's appeal to the judgment. (See *Keck*, *supra*, 232 Cal.App.4th at pp. 301-302.) However, because the order denying the JNOV is a separate appealable order (Code Civ. Proc., § 904.1, subd. (a)(4)), we further conclude that we have jurisdiction to consider Colmac's appeal of that order which, as we explain, we affirm.

BACKGROUND

A. *Factual Summary*

In 1980, Danny Stouffer and his wife, Susan Stouffer, founded DMF. Danny died in September 2009 after a prolonged illness. Susan testified when founded, DMF owned two trucks, one of which Danny himself drove, and employed two owner-operators. Susan did the billing for DMF. According to Susan, Danny always negotiated the rates the drivers received to haul loads. Before DMF began to haul loads for Colmac, DMF hauled loads for another client for at least 10 years.

In or around 1993, DMF began hauling wood chips to Colmac's plant. At the time, about 10 owner-operators worked for DMF. Danny alone was responsible for negotiating the terms of the contract with Colmac. Danny's contact at Colmac was Bates.

Bates testified she met Danny just after the Colmac plant opened, when Danny was working for a third-party supplier under a written contract with Colmac. According to Bates, initially all suppliers of materials were required to arrange their own transportation of materials to the plant. In late 1991 or early 1992, Danny proposed to Bates that Colmac pay Danny directly if he found the supplier and arranged for the transportation of wood chips from the supplier to Colmac. This arrangement proved

5

mutually beneficial after Danny located suppliers and arranged for the delivery of wood chips to Colmac's plant.

Susan testified that the negotiations between Danny and Bates led to a written services contract between DMF and Colmac. Susan saw the contract. However, in 1994 Danny's car was stolen. The contract was inside Danny's briefcase, which was inside the car. Neither the car nor the briefcase was ever recovered. Susan testified she subsequently asked Bates for a copy of the written contract, but it was never provided. Bates, however, testified there was an oral, but not a written, contract between DMF and Colmac with respect to the supply of wood chips. Bates noted there was a written contract between Colmac and DMF to haul ash.

Susan testified that drivers hauling wood chips for DMF were provided a log. The log required the driver to provide the date; a ticket number that the driver obtained from Colmac when the driver delivered the wood chips to the plant; the yard where the driver picked up the wood chips; the weight (in tons) of the wood chips hauled, which was determined at Colmac's "scale house" when the driver unloaded the wood chips; and the rate DMF paid its drivers. According to Susan, DMF and DMF alone, through Danny, set the rates paid to the drivers. Based on all these factors, DMF paid its drivers bimonthly.

According to Susan, Danny was responsible for making sure DMF obtained the right size and quality of wood chips required by Colmac. To do this, Danny would often visit various "wood yards." Sometimes Bates accompanied Danny on these visits.

Danny was always looking for new opportunities to supply wood chips to Colmac. For example, according to Susan, when a developer sought to build houses on an orange

6

grove, Danny would negotiate with the developer and turn the grove into wood chips to supply Colmac. Over the years, Danny grew DMF's business of supplying or "brokering" wood chips for Colmac. By 2010, Susan estimated that DMF had at least 30 drivers hauling wood chips to the Colmac plant. Record evidence showed that from 1998 until June 2010, Colmac paid DMF a little more than $36 million, or about $3 million annually.

As new suppliers were added by DMF, new rates had to be set for hauling the wood chips to Colmac. Susan testified that Danny, and Danny alone, set "all" the trucking rates used by DMF drivers to haul wood chips to Colmac and that Colmac at no time set those rates. Susan also testified that over the course of the 18-year relationship between DMF and Colmac, not once while the contract was in place did Colmac ever pay the haulers working for DMF.

Moreover, every two weeks Colmac sent DMF a single check for the delivery of wood chips and for other services DMF provided, including the delivery of ash. Thus, DMF was not given a check for brokering services and a separate check for its drivers.

Susan testified that Danny also set the rates for "fuel surcharges" that DMF paid the drivers. After Danny died, Susan testified DMF did not change its billing practices, or the rates it paid drivers or the rates it charged Colmac.

Kristie Walker, the daughter of Susan and Danny, also testified at the trial. Kristie started working for DMF in 1993. As DMF grew, Kristie's job responsibilities increased and she ultimately became office manager of DMF. As such, Kristie was responsible for dispatching trucks to the various yards, hiring and firing drivers, and mapping out the drivers' routes.

7

Kristie testified that since 1993, DMF hauled only for Colmac. According to Kristie, Danny, on behalf of DMF, and Bates, on behalf of Colmac, negotiated the rates Colmac would pay DMF. However, Danny alone set the rate DMF paid its drivers for hauling the wood chips.

As DMF's business expanded, Kristie hired new drivers to haul wood chips based in part on the recommendation of DMF drivers then hauling for the business. Before a driver was hired, Kristie testified she checked his or her references and made sure the driver had the proper equipment, a valid driver's license, insurance, and a printout showing his or her driving record. The drivers also were required to name DMF as an additional insured on their insurance policies. Colmac had no input as to who DMF hired to haul wood chips to Colmac. Colmac also had no input on driver discipline issues.

Kristie testified DMF set the routes the drivers used when they made pickups and deliveries of wood chips. Kristie testified it was important for the drivers to use certain routes because, in some cases, drivers were not allowed on certain roads and/or to cross certain bridges due to weight restrictions and similar requirements.

DMF occasionally held meetings for the drivers but, according to Kristie, more often DMF would issue bulletins for its drivers. However, when meetings were held, Kristie, Susan, Danny and the drivers would attend but no one from Colmac attended or was invited to attend.

After Danny became ill, Kristie gave Colmac a "driver call sheet" that included the names of the DMF drivers and their telephone numbers. Until Danny's death in September 2009, according to Kristie the relationship between DMF and Colmac had

8

always been "[g]reat." However, after Danny's death, that relationship began to change despite the fact Kristie and Susan operated DMF the same as when Danny had been alive.

In May 2010, Bates asked Kristie and Susan to attend a meeting to make sure everyone was "on the same page." In addition to Bates, Colmac's plant manager attended the meeting. During the meeting, they discussed the "structure" of DMF. Kristie characterized the tone of the meeting as "ugly," as Bates was upset over some incident that occurred when Kristie traveled to a wood yard. According to Susan, Bates was "yelling" and "beating on the table" during the meeting. Kristie described the meeting as "not productive."

After the meeting, Colmac's statements to DMF continued to include the number of daily loads DMF hauled to the plant. However, unlike the statements in the past, Colmac began to exclude from the DMF statements the total number of loads Colmac received on a daily basis. Kristie testified Colmac deleted this information because one of the issues Kristie discussed at the May 2010 meeting was her view that Colmac was cutting back DMF on the number of loads it hauled for Colmac. According to Kristie, Bates responded at the May meeting by telling Kristie that she should focus on the loads DMF was hauling, and not on the loads being hauled by other businesses.

In early June 2010, Bates called Kristie and asked that she attend a meeting at Colmac. Bates told Kristie the purpose of the meeting was to discuss the fact that DMF allegedly was not paying drivers "what she [i.e., Bates] told us [i.e., DMF] to pay the drivers." Kristie responded that DMF alone set the rates it paid its drivers and that what DMF paid the drivers was none of Colmac's "business." Bates in response hung up the phone on Kristie.

9

A day or two before Colmac terminated the DMF service contract, Bates again called Kristie to inform her Colmac's plant manager was going to be at Colmac's plant on Friday, June 11, 2010. Bates asked Kristie to attend a meeting at Colmac that same day. Because of Bates's behavior at the May 2010 meeting and the repercussions to DMF's business that resulted from it, Kristie decided not to attend the June 11 meeting.

On June 11, Colmac notified DMF that effective that same day, Colmac was terminating DMF's "freight services to the plant." Colmac based the termination on its findings "regarding the payment of truck rates, fuel surcharges, minimum tonnages and broker fees." Colmac further advised DMF that it would pay DMF's drivers directly for deliveries from May 16 through May 31 and from June 1 through June 11, and that it would pay DMF by "separate check" the broker fees it had earned during these same periods. The notification was signed by Bates and by a vice-president of Colmac. According to Kristie, this was the first time in the 18-year relationship between DMF and Colmac that Colmac had paid drivers hauling for DMF.

Because DMF since 1993 had worked exclusively for Colmac, Kristie immediately attempted to find other hauling work for DMF and its drivers. Kristie subsequently lined up other hauling work, including a contract with Gold Coast Recycling. DMF was unable to perform that contract or any others, however, because, according to Kristie, all of the truckers that hauled for DMF began working directly for Colmac and because Kristie, despite her best efforts, was unable to find drivers willing to work for DMF. Specifically, Kristie testified she called "all" of the truckers that previously had worked for DMF and called various yards inquiring whether DMF could use the yards' trucks for hauling, but none agreed to work for DMF.

Kristie testified she was unaware of any agreement between DMF and Colmac requiring DMF to pay its drivers specific rates or amounts set by *Colmac*, including, for example, with regard to a fuel surcharge that Colmac on occasion would pay when the cost of fuel went up by a certain amount, or with regard to a minimum tonnage Colmac paid because of concerns some of the loads were "light" because the wood chips were dry.

Bates testified that from the "very beginning" of their relationship, she and Danny agreed that Colmac would "dictate" the pay of the DMF drivers. As noted, Bates stated that there was never a written contract between Colmac and DMF but that Danny gave "his word" he would pay the DMF haulers the rates dictated by Colmac and set by Bates. Bates first became aware that the drivers were not being paid what they should have been paid per Colmac shortly before the proposed June 2010 meeting, when she reviewed invoices provided by the drivers.

Specifically, Bates testified every "two to three years" Colmac would send a "rate sheet" to DMF that in turn obligated DMF to pay its drivers the rates on the sheet set by Colmac.[1] Bates also testified that Danny agreed to pay DMF drivers 100 percent of the fuel surcharge Colmac paid to DMF, which payment was included in the lump-sum payment Colmac gave DMF every two weeks.

Bates testified that with respect to other haulers, Colmac did not specify how their drivers should be paid because it was up to the suppliers to make that determination.

---

[1]     The record shows the rate sheet Colmac provided DMF in or about April or May 2006 was in effect when Colmac terminated the services contract with DMF in June 2010, more than four years after it was received by DMF.

Bates testified Colmac's arrangement with DMF was unique or "different" in this respect, as Colmac did have the authority to dictate what DMF paid its drivers.

Bates testified that after Danny died in 2009, Colmac did not have the "support in the field" it once had when Danny was alive because he was always trying to find new sources of wood supply for Colmac and to do so, he would visit yards and talk to people several days each week. Although Bates preferred working with Danny, she testified she did not have a problem working with Susan or Kristie.

In 2010, Colmac sought to sell its plant. Bates testified she wanted to continue working at the plant after the sale. Bates recognized that as the "fuel manager" of the plant, it was her job to bring in wood as cheaply as possible. With respect to the May 2010 meeting with Kristie and Susan, Bates denied the meeting became "heated" at any point.

Bates testified that about a month after the May meeting, a driver for DMF complained to a Colmac employee working in the scale house about his loads being "light." The employee responded that to offset the light loads, Colmac paid the drivers based on a 22-ton minimum. When the driver denied being paid a minimum, the Colmac employee reviewed the driver's statement from DMF and determined the driver was not in fact being paid the minimum, as Colmac believed was required under the oral agreement between Bates (i.e., Colmac) and Danny (i.e., DMF).

Bates testified that in response to this information, she talked to other DMF drivers, reviewed their statements and confirmed they too were not receiving what Colmac dictated they should receive. As a result, Bates called Kristie and told her there were "discrepancies" in what DMF was paying its drivers, not only with respect to the

12

22-ton minimum, but also with respect to the fuel surcharges and the driver rates. Bates asked Kristie to attend a meeting at the plant on Friday, June 11, 2010. When nobody from DMF showed up for the Friday meeting, Bates testified she, on behalf of Colmac, terminated the DMF services contract.

Bates testified she next drafted a notice to "All DMF drivers," dated June 11, 2010, informing them of the termination of the DMF services contract with Colmac. The notice stated that Colmac would "begin to dispatch the trucks direct[ly]" and that if the drivers were "interested in hauling direct[ly] for Colmac Energy, you will need to complete the attached form and provide the necessary paperwork." The notice also provided that Colmac would pay the drivers directly for loads hauled from May 16 to May 31, 2010 and from June 1 to June 15, 2010. Finally, the notice provided that there would be a meeting at Colmac's plant the following day, a Saturday, at 9:00 a.m. "to answer any . . . questions"; that drivers should "try to attend" the meeting; and that Colmac would "try to make the transition as quickly as possible."

Bates testified this was the first time Colmac had ever dispatched its "own" trucks, but it was necessary to do so to ensure Colmac's wood supply was not disrupted. Although Bates was prepared to call other drivers if the DMF drivers did not sign on with Colmac, it was unnecessary to do so because all the DMF drivers ended up hauling directly for Colmac.

At the Saturday meeting, the DMF drivers were required to sign a "sign in" sheet. Although a few of the 29 drivers who signed in drove for other businesses, most of the drivers worked only for DMF. Some of the DMF drivers also had their own companies

13

and hired their own trucks to haul wood chips for DMF.  Bates along with other Colmac employees attended the meeting.

Before any of the drivers spoke or asked questions, Bates told them that "there was a discrepancy in the rates that the drivers should have been paid" by DMF.  During the meeting, Bates handed the drivers a "rate sheet" showing what she and Colmac believed DMF all along should have been paying the DMF drivers for hauling wood chips to the plant.

Bates testified she never explained to the drivers what she meant by "discrepancy." According to Bates, none of the drivers asked what she meant by "discrepancy."  Bates stated the drivers did not become upset about their pay until after the meeting.

Bates testified when she told the drivers there was a "discrepancy" in the rates they were being paid by DMF, she did not tell them there were instances when DMF was in fact paying them the "full" truck rate set by Colmac.  In addition, when asked whether her use of the word "discrepancy" suggested to the drivers they were being paid less than what Colmac directed DMF to pay them, Bates testified that she did not tell the drivers they were being paid less or more than required by Colmac and that the drivers "could draw their own conclusions" regarding what she meant by the statement.

Bates admitted, however, that by giving the drivers the rate sheet and by using the word "discrepancy," she and Colmac were essentially telling them they were being paid *less* by DMF for hauling wood chips than what they should have received based on the rates set by Colmac.  Bates also admitted that cutting out DMF and directly hiring its drivers saved Colmac money and that, regardless of what DMF was paying its drivers, Colmac was not losing any money because Colmac always paid DMF the same rates.

14

Witness Gerald Moffatt testified in 2010 he was CEO and president of Rainbow Environmental Service (Rainbow), a business located in Huntington Beach, California. DMF acted as the broker and arranged to haul wood and other materials from Rainbow's yard to Colmac. Moffatt testified that he knew Danny, Susan and Kristie and that he never had any problems or issues with them or DMF, including in the 2009 time frame. Moffatt also testified that DMF had a reputation of "mov[ing] quite a bit of material," but that his company stopped using DMF after June 2010 because DMF no longer hauled to Colmac's plant.

Witness Ramon Ramos testified he began driving for DMF in 1995 and continued to drive for DMF off and on until 2010, when Colmac terminated the DMF services contract. Over the years, Ramos testified that he and those who hauled for DMF were "happy"; that DMF always kept him busy; that he knew the rate he would be paid by DMF before he went to a yard; and that DMF always paid him on time.

Ramos testified he was "shocked" when he read the bulletin prepared by Bates notifying the DMF drivers that Colmac had terminated the DMF services contract. Ramos attended the meeting at Colmac the following day. During the meeting, Bates informed the DMF drivers that there were some "differences" or "discrepancies" and that Colmac asked DMF for a meeting to discuss the differences but that DMF was unwilling to attend. Ramos also received a rate sheet from Colmac that showed DMF was paying the drivers less than the rates shown on that sheet.

Ramos testified he understood the "differences" in rates to mean that DMF drivers "were getting cut a little bit more than we were supposed to" "[a]s far as [our] pay." At

the end of the meeting, Ramos testified he and all other DMF drivers signed up to drive for Colmac. According to Ramos, none of the drivers ever went back to work for DMF.

DMF's economic expert, Jennie McNulty, testified that when she reviewed over 2,000 invoices generated between DMF and Colmac from 2006 through June 2010, she found that DMF drivers picked up wood chips at 56 different wood yards and then delivered them to Colmac's plant; that the 2006 rate sheet generated by Colmac was based on yards/suppliers and *not* on individual drivers; that of those 56 yards, only 23 of them were included on the 2006 Colmac rate sheet, which rates Colmac alleged DMF was required to use to pay the DMF drivers; and thus, that there were 33 yards that were not listed on the Colmac rate sheet.

McNulty opined that of the 23 yards that were on the rate sheet, the invoices showed the rates DMF paid its drivers from 17 of those yards differed from Colmac's rates. McNulty further opined that between 2006 and June 2010, all drivers were consistently paid the same rate when they hauled wood chips from those 17 yards. With respect to the remaining six yards, McNulty opined the drivers were paid the same rate that appeared on Colmac's rate sheet.

After reviewing DMF's books from 1999 through mid-2010, McNulty testified DMF earned about 15 percent "net profit" for every dollar Colmac paid DMF. Using the 15 percent figure, McNulty considered the value of the Gold Coast Recycling contract DMF lost because of its inability to hire drivers. McNulty opined the value of the Gold

16

Coast Recycling contract would have been $780,000 a year, or about $117,000 in annual profits lost by DMF under that contract.[2]

B. *Procedural Summary*

As noted, DMF asserted slander per se and interference with prospective economic relations causes of action against Colmac and Bates. Colmac cross-complained against DMF, Susan and Kristie, asserting causes of action for promissory fraud, fraudulent concealment, conversion by false pretenses and violation of Business and Professions Code section 17200 et seq. Colmac in its cross-complaint alleged that DMF was required to pay the DMF truckers the rates set by Colmac; that in May 2010, Colmac discovered DMF was not doing so but rather "was retaining for itself money that was supposed to go to the truckers"; and that because of DMF's "fraudulent conduct and unlawful business practice," Colmac stopped using DMF as a broker to haul loads to Colmac's plant. Colmac sought compensatory and punitive damages against DMF, Susan and Kristie.

The jury in the special verdict form found that a contract existed between DMF and Colmac; that DMF substantially complied with the terms of that contract; and that Colmac failed "to do something" required under that contract and that failure caused DMF harm.[3]

---

[2]     The record shows Kristie estimated that DMF's profit from the Gold Coast Recycling contract would have been about 10 percent of the money it received under the contract. We note, however, that the discrepancy between the 10 and 15 percent figures is not an issue in this appeal because Colmac is "not arguing that the $400,000 is not supported by substantial evidence *if* causation was proved." (Italics added.)

[3]     Colmac has not appealed the jury's finding Colmac breached the contract with DMF with respect to the nonpayment of broker fees for May and June 2010, including the award of $13,000 in favor of DMF.

17

With respect to the defamation cause of action, the jury found Bates made the statement that there "was a discrepancy in the rates" to a person other than DMF and that it was made with malice toward DMF; that the person or persons to whom the "discrepancy" statement was made (i.e., the truckers) reasonably understood it both pertained to DMF and meant DMF had committed a crime; that the statement was not "substantially true"; and that Bates failed to use reasonable care to determine its truth or falsity. After finding Bates's conduct was a substantial factor in causing DMF actual harm, as noted the jury awarded DMF $400,000 in damages for harm to DMF's "property, business, trade, profession, or occupation" and $1.35 million in damages for harm to DMF's "reputation."

As also noted, the jury found Bates intended to disrupt the economic relationship between DMF and its drivers and that she engaged in wrongful conduct "through defamation" to disrupt that relationship. After finding Bates was acting in the course and scope of her employment when she engaged in the wrongful conduct and that such conduct was a substantial factor in causing harm to DMF, the jury awarded DMF economic damages of $400,000.

The jury also found that DMF proved by clear and convincing evidence that Bates acted with "malice, oppression, or fraud" when making the defamatory statement and when she interfered with the economic relationship between DMF and its drivers. The jury awarded DMF $100,000 in punitive damages as a result.

On Colmac's cross-complaint, the jury found neither Susan, Kristie nor DMF made a promise to Colmac that was "important to the transaction" for purposes of the failure to pay as promised cause of action. The jury also found neither Susan, Kristie nor

18

DMF intentionally failed to disclose an important fact that Colmac "did not know and could not reasonably have discovered"; and finally, that Colmac did not have any "ownership interest in money that it provided to DMF" for purposes of Colmac's conversion cause of action.

Following the verdict, Colmac moved for a new trial and for JNOV.

DISCUSSION

I

Appellate Jurisdiction

As noted, we requested supplemental briefing from the parties concerning whether we have appellate jurisdiction over the appeal of Colmac to the judgment and to the denial of the JNOV motion and over the appeal of DMF to the court's order granting a motion for new trial on defamation damages. As we discuss, because we affirm the trial court's order granting the new trial motion, we conclude we lack appellate jurisdiction to consider Colmac's appeal of the judgment, although we further conclude we have jurisdiction to consider Colmac's appeal to the denial of the JNOV because it is a separate appealable order.

It is axiomatic that a judgment is vacated when a motion for new trial is granted.[4] (*Keck*, *supra*, 232 Cal.App.4th at p. 302; *Marshall v. Brown* (1983) 141 Cal.App.3d 408, 414 (*Marshall*).) This rule applies even when the trial court grants only a partial new

---

[4] In contrast to an order granting a new trial motion when the judgment is vacated, an order denying such a motion is not independently appealable "'and may be reviewed only on appeal from the underlying judgment.' (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19 . . . .)" (*Keck*, *supra*, 232 Cal.App.4th at p. 302.)

19

trial. (*Beavers*, *supra*, 225 Cal.App.3d at p. 329.) The *Beavers* court explained: "[T]he rule is settled that the portions of the judgment which are not subject to the new trial order are nevertheless not appealable. The courts have reasoned that the new trial order has the effect of vacating the entire judgment and holding in abeyance the portions which are not subject to a new trial until one final judgment can be entered. [Citations.] As [one] court explained it in the context of a new trial on the single issue of damages, the 'superior court judgment was set aside in its entirety when the court granted a new trial as to damages . . . .' [Citation.] 'As there can be only a single judgment in an action, if the order granting the limited new trial of damages is to stand, there will be no final judgment until the trial of that issue ends and the determination of the appeal, if any, from the then judgment.'" (*Ibid.*)

In *Keck*, this court recently held it lacked jurisdiction to hear a former employer's appeal of a judgment in favor of a former employee after the trial court granted the former employee's motion for additur or, in the alternative, for a new trial on damages. In reaching our decision, we rejected the contention of the former employer that it would be "anomalous" to consider, and possibly affirm, a "new trial on *damages* and to consider claims that go to *liability* in a subsequent appeal." (*Keck*, *supra*, 232 Cal.App.4th at p. 303.) We noted, however, that is "precisely the outcome that case law contemplates." (*Ibid.*)

Similarly, in *Marshall* the court granted the parties' motions for new trial after the jury initially returned a verdict in favor of the plaintiff former employee that was inconsistent as it related to the defendant corporate employer and to the individual defendant who managed the corporation. The jurors deliberated further to consider the

issue of damages. Shortly thereafter, the jury returned a verdict that was less than its original verdict. (*Marshall*, *supra*, 141 Cal.App.3d at p. 413.)

After judgment was entered, the plaintiff moved for additur or for a new trial on damages only. The defendants also moved for new trial. The trial court granted the motions on the "'grounds of inadequate and excessive damages'" unless both sides agreed to the consent of entry of judgment based on amounts provided in the order. (*Marshall*, *supra*, 141 Cal.App.3d at p. 413.)

The *Marshall* court, like our decision in *Keck*, concluded the grant of the new trial motions resulted in the judgment being vacated because there was "no longer a judgment, any appeal must be from the order granting a new trial." (*Marshall*, *supra*, 141 Cal.App.3d at p. 414.) For reasons of judicial economy, the court in *Marshall* therefore refused to review the defendants' other contentions on appeal that were "not likely to be renewed in a new trial limited to damages," including whether the court erred in admitting certain evidence and whether counsel engaged in misconduct. (*Id.* at pp. 415-416.) The court stated consideration of those issues "will have to await entry of judgment, from which defendants will then have a right of appeal." (*Id.* at p. 416.)

When an order granting a new trial motion is *reversed*, however, a court of review then may consider the appeal of the judgment. (*Keck*, *supra*, 232 Cal.App.4th at p. 304, citing *Spencer v. Nelson* (1947) 30 Cal.2d 162, 164 (*Spencer*).) In *Keck*, we concluded the *Spencer* "exception" did not apply because we "*affirm*[ed] the trial court's order granting a new trial on damages, and thus, upon the finality of our opinion [in *Keck*], the underlying judgment is 'absolutely vacated.' [Citation.]" (*Keck*, *supra*, 232 Cal.App.4th at p. 304.)

In light of the foregoing and as discussed *post*, we conclude the trial court properly exercised its broad discretion when it granted in part Colmac's new trial motion only on the issue of defamation damages. As such, we further conclude the *Spencer* "exception" does not apply in this case. However, as noted, we do have jurisdiction to consider Colmac's appeal of the denial of its JNOV motion, which we turn to next.

II

JNOV Motion

A. *Guiding Principles*

"A trial court must grant a motion for JNOV whenever a motion for a directed verdict for the aggrieved party should have been granted. ([Code Civ. Proc.,] § 629.) '"[T]he power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit.' [Citation.] 'A motion for a directed verdict "is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom."'" [Citation.]

"Ordinarily, when reviewing a ruling on a motion for JNOV, 'an appellate court will use the same standard the trial court uses in ruling on the motion, by determining whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict. """If there is any substantial evidence, or *reasonable inferences to be drawn therefrom in support of the verdict*, the motion should be denied."'" [Citation.]" (*Keck*, *supra*, 232 Cal.App.4th at p. 309, italics added; see also *Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 743 [noting the purpose of

a JNOV "'is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation'"].)

B. *Slander*

Civil Code section 46 provides: "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶] 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; [¶] 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; [¶] 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] 4. Imputes to him impotence or a want of chastity; or [¶] 5. Which, by natural consequence, causes actual damage."

"Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage. [Citations.] Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made. Publication need not be to the 'public' at large; communication to a single individual is sufficient. [Citations.] . . .

"Where the words or other matters which are the subject of a defamation action are of ambiguous meaning, or innocent on their face and defamatory only in the light of extrinsic circumstances, the plaintiff must plead and prove that as used, the words had a

23

particular meaning, or 'innuendo,' which makes them defamatory. (*Washer v. Bank of America* (1943) 21 Cal.2d 822, 828-829 [(*Washer*)], overruled on other grounds, *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 551 [(*MacLeod*)] . . . .) Where the language at issue is ambiguous, the plaintiff must also allege the extrinsic circumstances which show the third person reasonably understood it in its derogatory sense (the inducement). [Citations.]

"In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose. [Citations.] The defendant must 'justify,' or show the truth of the statements. If the statements are not defamatory on their face but are capable of a defamatory meaning imputed by innuendo, the defendant must demonstrate the truth of the statements in that sense in which the plaintiff's innuendo explains them. . . .

"The question whether a statement is reasonably susceptible to a defamatory interpretation is a question of law for the trial court. Only once the court has determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood. [Citations.]" (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645-647, fns. omitted (*Smith*).)

C. *Analysis*

The record shows the trial court denied Colmac's JNOV motion with the exception of the punitive damages award against Bates personally, which DMF conceded was inappropriate because there was no evidence proffered at trial regarding her financial condition.

24

1.  Bates's "Discrepancy" Statement Does Not Fail as a Matter of Law

In connection with its JNOV, Colmac contends Bates's "discrepancy" statement was not slanderous per se under Civil Code section 46 because, according to Colmac, the statement "on its face" must allegedly "clearly convey" a meaning that qualifies under the first four subdivisions of Civil Code section 46. Colmac relies on *Regalia v. The Nethercutt Collection* (2009) 172 Cal.App.4th 361 (*Regalia*) to support this contention.

However, we conclude that *Regalia* is inapposite because, unlike the facts in *Regalia* where the jury found plaintiff did *not* suffer any actual damages, the jury in the instant case awarded DMF compensatory damages. The court in *Regalia* noted the importance of this distinction when it recognized that a slander that does not fall within the first four subdivisions is slander per quod and, thus, only actionable when special damages are proved. (*Regalia*, *supra*, 172 Cal.App.4th at p. 367; see *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 107 [noting slander per se is actionable without proof of special damages].)

Moreover, the court in *Regalia* concluded the statements there at issue were not reasonably susceptible to a slanderous interpretation, which is in contrast to the instant case where the "discrepancy" statement by Bates was, when considered in context (i.e., with innuendo; see *Washer*, *supra*, 21 Cal.2d at p. 828), reasonably susceptible to such an interpretation for the issue to go to the jury. (See *MacLeod*, *supra*, 52 Cal.2d at p. 546 [stating the general rule that whether a statement is "reasonably susceptible" to defamatory interpretation is a "question for the court and, if so, whether or not it was so understood is a question for the jury"].)

In any event, we disagree with *Regalia* to the extent it suggests that as a matter of law a statement cannot be actionable within the first four subdivisions of Civil Code section 46 *unless* the statement is defamatory on its face. We note Civil Code section 46 contains no such limitation.

In addition, we note our high court in *Washer* rejected such a rule when it concluded the word "falsified," which was used by plaintiff's former employee to describe plaintiff's actions in connection with an employee expense account, was subject to more than one meaning, and, thus, when it further concluded that for plaintiff to "state a cause of action for the use of the word 'falsify' *as one charging him with a crime*, it was necessary for [plaintiff] to plead that meaning by *innuendo*." (*Washer*, *supra*, 21 Cal.2d at p. 828, italics added.)[5] *Washer* teaches that, when the offending language is ambiguous or not on its face slanderous, "in addition to an innuendo" it is "necessary for the plaintiff to allege special damages by reason of the meaning gained from the publication." (*Ibid*; see 1 Sack on Defamation (4th ed. 2010) § 2:8.4, p. 2-131 ["It is a question of law, for the court to determine, whether a communication is libelous or slanderous per se. But it remains within the province of the jury to determine whether the reader understood the article, in light of the relevant *extrinsic facts*, *if any*, to be defamatory." (italics added)].)

_____

[5]     In contrast, the *Washer* court found the "falsify" statement and the statement that plaintiff was "guilty of flagrant insubordination" were defamatory on their face with respect to subdivision 3 of Civil Code section 46, as these collective statements, by their "natural and probable effect," tended to injure the plaintiff in his occupation, trade or business. (*Washer*, *supra*, 21 Cal.2d at pp. 827-828.) The *Washer* court thus concluded no innuendo was required to show slander under subdivision 3 of Civil Code section 46.

We thus reject Colmac's contention that DMF was precluded as a matter of law from establishing Bates's "discrepancy" statement was slanderous merely because the statement was also susceptible to an innocent interpretation (see *MacLeod*, *supra*, 52 Cal.2d at pp. 550-551) or on its face was ambiguous. (See *Washer*, *supra*, 21 Cal.2d at p. 828; see also 5 Witkin, Summary of California Law (10th ed. 2005) Torts, § 555, p. 811 [noting that "[w]here words or other matters are of ambiguous meaning, or are innocent on their face but defamatory in light of extrinsic circumstances (i.e., not defamatory 'per se'), the plaintiff must plead and prove that they were used in a particular meaning that makes them defamatory (the 'innuendo')"].)

2. The "Discrepancy" Statement, in Context, Was Reasonably Understood to Suggest DMF Committed a Crime[6]

Colmac next contends JNOV should have been granted because there was no evidence that the truckers understood Bates's "discrepancy" statement to mean that DMF committed a crime, as found by the jury.[7] During the hearing on the JNOV motion, the

---

[6] We note Colmac's opening brief raises myriad additional issues that were *not* included in Colmac's JNOV. In light of our conclusion *post* that the court properly granted in part Colmac's new trial motion, we do *not* address in this opinion any contentions raised by Colmac that were not raised in its JNOV motion. (See *Keck*, *supra*, 232 Cal.App.4th at p. 304.)

[7] As noted, DMF's operative complaint alleged Bates's "discrepancy statement" was slanderous not only because it accused DMF of committing a crime, namely theft or embezzlement, but *also* because it tended to injure DMF with respect to its "profession, trade or business," as set forth in Civil Code section 46, subdivision 3. For whatever reason, however, the jury was limited in the special verdict to deciding whether the "discrepancy statement" could be reasonably understood to accuse DMF of a crime pursuant to Civil Code section 46, subdivision 1.

27

trial court in connection with this specific issue found there was evidence that, if credited, could be reasonably understood by the truckers that DMF was stealing from them:

"THE COURT:  I thought about this a lot.  Does it matter whether it's defamation per se?

"[Colmac's counsel]:  Per se.

"THE COURT:  Yeah, because either way, there's sufficient evidence to support that there was a statement [by Bates], and in the context it was accusing DMF of stealing from the drivers.  [¶] . . . [¶]

"[Colmac's counsel]:  Yeah.  But the crime might be stealing from your workers. But saying there was a discrepancy in the rates, does not clearly convey the meaning of stealing from the workers.

"THE COURT:  What other means do you have?

"[Colmac's counsel]:  It could mean bad bookers, negligence.  It could mean hundreds of different things other than committing a crime.  *Possibly it could be committing a crime*, but I don't know how underpaying an independent contractor rises to the level of committing a crime.

"THE COURT:  How about getting money for that fuel charge that was supposed to go to the drivers, then keeping it, putting it in your own pocket.  I don't know how there's not a reasonable inference that's accusing him of a crime.

"[Colmac's counsel]:  Well, because it could mean a lot -- this was what we're talking about was defamation per se.  It has to clearly convey on its face there was a commission of a crime."  (Italics added.)

28

Theft is defined in Penal Code section 484, subdivision (a) in part as follows: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall *fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money*, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft." (Italics added.)

Embezzlement is defined in Penal Code section 532, subdivision (a) as follows: "Every person who knowingly and designedly, by any *false or fraudulent representation or pretense, defrauds any other person of money*, labor, or property, whether real or personal, or who causes or procures others to report falsely of his or her wealth or mercantile character, and by thus imposing upon any person obtains credit, and thereby fraudulently gets possession of money or property, or obtains the labor or service of another, is punishable in the same manner and to the same extent as for larceny of the money or property so obtained." (Italics added.)

Initially, we note the above exchange from the JNOV hearing shows Colmac recognized that Bates's discrepancy statement was potentially ambiguous *and* that the statement could be interpreted to mean that DMF had committed a crime, which, as we discussed *ante*, was all that was required for the issue to go to the jury under the circumstances of this case, where special damages are alleged. (See *Washer*, *supra*, 21 Cal.2d at p. 828.)

29

In any event, indulging, as we must, every favorable inference that may be drawn from the evidence (see *Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1144), we independently conclude there is sufficient evidence in the record to support the jury's finding that the DMF truckers reasonably could have understood Bates's discrepancy statement, when considered in context, to mean that DMF had committed the crime of theft and/or embezzlement. (See *Clay v. Lagiss* (1956) 143 Cal.App.2d 441, 445 (*Clay*) [noting a charge of theft is slanderous per se].)

Indeed, the record shows that the day before the meeting when Bates made the discrepancy statement, Colmac, after an 18-year relationship, terminated the services contract with DMF. After doing so, Bates prepared on behalf of Colmac a notice to "All DMF drivers" stating that a meeting would take place the following day—a Saturday—at Colmac's plant and that Colmac would pay the drivers directly for loads hauled from May 16 to May 31 and from June 1 to June 15, 2010. The record shows this was the first time that Colmac had ever paid drivers directly.

Ramos testified that during the Saturday meeting at the Colmac plant, Bates informed the DMF drivers that there were some "differences" or "discrepancies" *and* that Colmac had asked DMF for a meeting to discuss this issue but that DMF was unwilling to meet. After Bates handed each of the drivers a rate sheet, Ramos testified he came to the conclusion that that the DMF drivers "were getting cut a little bit more than we were supposed to" "[a]s far as [our] pay."

Moreover, Bates acknowledged at trial that using the word "discrepancy" at the meeting suggested to the drivers that, in context, DMF was paying them less than what

30

Colmac and she thought they should have been after Bates *also* provided the drivers a sheet showing the rates Colmac was paying DMF.

In light of the long history of dealings between Colmac and DMF, the sudden termination by Colmac of the DMF services contract a day earlier, the notice it and not DMF would be paying the drivers for loads they hauled in May and June 2010, and the statement by Bates during the meeting that DMF had refused to attend a meeting to the explain the "discrepancy," we independently conclude there is sufficient evidence to support the jury's finding that the truckers reasonably could have understood Bates's discrepancy statement to mean that DMF had committed the crime of theft and/or embezzlement. (See Pen. Code, §§ 484, subd. (a) [providing theft is when a person "steal[s]" or "take[s]" or "fraudulently appropriate[s]" the "personal property" of another, including "money"] & 532, subd. (a) [providing embezzlement is when a person "knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money"]; *Clay*, *supra*, 143 Cal.App.2d at p. 445; *Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1284 (*Boyce*) [noting that on "appeal from the denial of a JNOV motion, this court reviews the record in order to make an independent determination whether there is any substantial evidence to support the jury's findings"].)

Finally, as noted Colmac in its cross-complaint accused DMF, Susan and Kristie of engaging in fraudulent and other wrongful conduct when DMF kept money for itself that Colmac entrusted would be paid to the DMF drivers as Danny and Bates had allegedly agreed under the terms of the parties' contract. Specifically, Bates testified the amounts DMF "wrongfully paid [itself]" and not the truckers from 2007 to 2010 was in

31

excess of $350,000. These allegations and evidence further support the finding of the jury that the truckers reasonably understood that DMF committed a crime when it unlawfully and intentionally kept money Colmac contended rightfully belonged to the truckers.

3. <u>There Is Sufficient Evidence to Support the Jury's Finding that the "Discrepancy" Statement Was a Substantial Factor in Causing DMF Harm</u>

Colmac next contends there is no evidence "that DMF was unable to recruit drivers to fulfill the supposed Gold Coast contract *because of* the defamation." The record shows that with respect to causation, the jury was instructed that DMF was "entitled to recover its actual damages if it proves that Colmac Energy, Inc.'s and Paula Bates' wrongful conduct was a substantial factor in causing" DMF harm. The record further shows, however, that the jury was not instructed with CACI No. 430[8] on the meaning of substantial factor and that in closing argument, the parties' counsel did not address in any meaningful way the meaning of "substantial factor."

"The concept of proximate or legal cause has 'defied precise definition.' [Citations.] . . . [¶] Whether a defendant's conduct actually caused an injury is a question of fact [citation] that is ordinarily for the jury [citation]. . . . Our Supreme Court has . . . observed that the 'substantial factor' test generally subsumes the 'but for' test. [Citation.] [¶] However the test is phrased, causation in fact is ultimately a matter of probability and

---

8    CACI No. 430 provides: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]"

32

common sense."  (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 252–253.)

Moreover, the "substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Rutherford v. Owens–Illinois, Inc.* (1997) 16 Cal.4th 953, 978 (*Rutherford*).)  Even "a very minor force" that causes harm is considered a cause in fact of the injury.  (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.)  However, "'a force which plays only an "infinitesimal" or "theoretical" part in bringing about [the] injury . . . is not a substantial factor.'"  (*Ibid.*)

The record shows some of the DMF drivers had worked for DMF for more than a decade.  Ramos testified he worked on and off for DMF for over 15 years and knew of other drivers who worked for DMF just as long if not longer.

McNulty testified that over a 12-year span, she determined that on average a DMF driver stayed with the company for three and a half years.  Some drivers, according to McNulty, worked for DMF for the entire 12-year span she studied.

Furthermore, Kristie testified part of her job responsibilities at DMF was to recruit new drivers.  According to Kristie, when DMF needed new drivers it would ask then-current DMF drivers to recommend new drivers for hire.  Kristie also testified that after Colmac terminated DMF's service contract and hired all of the DMF drivers to haul directly for Colmac, she went to several other plants that, like Colmac, burned "bio mass and wood chips" to secure new contracts.  As noted, she testified DMF ultimately secured a contract from Gold Coast Recycling, but DMF lost that contract to another hauler because DMF had no trucks to do the work and fulfill the contract.

33

Specifically, Kristie testified that she called up "all the owner operators that were hauling for [DMF] and was trying to get work, you know, get them back." None of the DMF drivers ever returned to haul for DMF, however. Kristie also testified DMF lost another business opportunity with Delano Energy for the same reason—DMF could not find trucks willing to haul for DMF.

In addition, the record shows that up until Colmac terminated the services contract with DMF in June 2010, DMF had hauled *exclusively* for Colmac. Indeed, Moffatt (the CEO and President of Rainbow) testified that DMF hauled materials between his company and Colmac and that after Colmac terminated DMF's service contract, Rainbow "stopped using DMF," despite the fact DMF previously had a good reputation and was known to "move[] quite a bit of material."

We independently conclude this evidence, and the reasonable inferences to be drawn from it, support the jury's finding that Bates's discrepancy statement, when considered in context, was more than a "negligible or theoretical" factor in causing DMF's harm. (See *Rutherford*, *supra*, 16 Cal.4th at p. 978.) Indeed, before the Saturday meeting when Bates made the discrepancy statement and Colmac gave the drivers a rate sheet showing the rates Colmac contended the drivers should have been paid (a theory rejected by the jury), DMF had between 30 and 40 drivers hauling for the company, many of whom had been driving for DMF for years. After the meeting, however, DMF had no drivers and, per Kristie's testimony, despite DMF's best efforts it was unable to hire new drivers "for a very long time." As such, the court properly denied JNOV on the issue of causation. (*Boyce*, *supra*, 158 Cal.App.4th at p. 1284.)

34

4.  DMF Proved an "Independent Wrongful Act," and Substantial Evidence Supports the Jury's Finding this Act Was a "Substantial Factor" in Causing DMF harm, for Purposes of its Interference Claim

Colmac contends the trial court also erred when it denied JNOV because DMF failed to show Colmac engaged in an independent wrongful act for purposes of DMF's interference claim.  (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153.)  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  (*Id.* at p. 1159.)

Here, in light of our conclusion that Bates's discrepancy statement is slanderous because, when considered in context, it accused DMF of a crime (i.e., theft and/or embezzlement of money Colmac maintained rightfully belonged to the DMF drivers that was unlawfully and fraudulently kept by DMF), and in light of our conclusion that this statement was a substantial factor in bringing about DMF's harm, given its inability to hire any drivers to fulfill the Gold Coast Recycling contract, we conclude DMF has shown an independent wrongful act for purposes of its interference claim.

In addition, based on our conclusion that the jury's finding that Bates's discrepancy statement was more than a "negligible or theoretical" factor in causing DMF's harm for purposes of defamation (see *Rutherford*, *supra*, 16 Cal.4th at p. 978), we likewise conclude this same evidence supports the causation finding of the jury in connection with DMF's interference claim.  As such, we independently conclude JNOV was properly denied on this basis.  (See *Boyce*, *supra*, 158 Cal.App.4th at p. 1284.)

35

5. Punitive Damages against Colmac Based on Bates's Conduct as a "Managing Agent"

Lastly, Colmac contends the trial court erred in denying JNOV because the jury was not required to find in the special verdict form that the "wrongful act" giving rise to punitive damages "was committed by an officer, director or managing agent of the entity or was ratified by the corporation."

A plaintiff is entitled to punitive damages under Civil Code section 3294, subdivision (a) if the plaintiff shows "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." When the defendant is a corporation, "[a]n award of punitive damages . . . must rest on the malice of the corporation's employees. [¶] But the law does not impute every employee's malice to the corporation." (*Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 167.) Instead, the oppression, fraud, or malice must be perpetrated, authorized, or knowingly ratified by an officer, director, or managing agent of the corporation. (Civ. Code, § 3294, subd. (b).)

Our Supreme Court has interpreted "managing agent" in the context of subdivision (b) of Civil Code section 3294 to include "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy. The scope of a corporate employee's discretion and authority under our test is therefore a question of fact for decision on a case-by-case basis." (*White v. Ultramar* (1999) 21 Cal.4th 563, 566-567.) The *White* court explained that the authority to hire or fire is not determinative of the managing agent issue: "In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would

36

have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id.* at p. 577.)

We conclude the special verdict form was not fatally defective on the issue of whether Bates was a "managing agent" of Colmac. It is axiomatic that a jury must resolve all of the ultimate facts presented to it in the special verdict, so that """nothing shall remain to the court but to draw from them conclusions of law."'" (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 959-960.) We note, however, this requirement is limited to issues that are "'controverted.'" (See *Id.* at p. 960.)

Here, we independently conclude the issue of whether Bates was a "managing agent" of Colmac was uncontroverted. Indeed, the record shows that since Colmac began operations in the early 1990's, Bates has acted as its all-important "fuel manager." The record also shows that Bates signed the notice of termination that Colmac sent DMF on June 11, 2010; that Bates on that same day prepared the notice informing all DMF drivers of the termination of the DMF services contract and of the meeting the following day at Colmac's facility; that Bates on behalf of Colmac addressed the DMF drivers at that meeting and discussed the reason(s) for Colmac's termination of the services contract with DMF; that Bates prepared a June 14, 2010 memorandum on behalf of Colmac regarding the reason(s) for Colmac's termination of the services contract, in which Bates explained that "*we* had a problem with payments to the trucks" and that "*we* had discrepancies in the rates, minimum loads, and fuel surcharges" DMF was paying its truckers (italics added); and that Bates in late June 2010 sent DMF correspondence regarding "[f]inal [i]nvoicing," which advised Kristie that Colmac would be paying the

37

"drivers for shortages they incurred in their payment from DMF Trucking for the month of May, 2010."

We independently conclude such evidence, when also considered in light of the other evidence discussed *ante*, including Bates's extensive and continuing role in negotiating on behalf of Colmac the services contract with Danny and in ensuring Colmac had a sufficient supply of wood chips and other materials to burn at its plant, supports the conclusion that the issue of Bates acting as a "managing agent" of Colmac was uncontroverted.

In any event, we also conclude any error in the special verdict form is harmless in view of the above evidence in this case. (See *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1244 [rejecting any contention that a defective special verdict form is reversible per se for structural error]; see also Cal. Const., art. VI, § 13 [providing "[n]o judgment shall be set aside . . . as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].) For this separate reason, we conclude Colmac's JNOV was properly denied with respect to the award of punitive damages against Colmac.

III

New Trial Motion

A. *Additional Background*

As noted, Colmac also moved for a new trial under Code of Civil Procedure

section 657,[9] including on the grounds of excessive or inadequate damages and/or insufficiency of the evidence to justify the verdict or other decision. Colmac alleged there was no evidence in the record to support the jury's finding that Bates's statement there was a discrepancy in the rates DMF was paying its truckers caused $1.35 million of "'actual damages'" to DMF's reputation. In addition, Colmac proffered the declarations of two jurors, including the jury foreperson, who stated the jury arrived at the damage figure for reputation harm not by looking at the evidence of actual damage, but rather by taking a percentage of Colmac's net worth.

---

[9]    Code of Civil Procedure section 657 provides in relevant part: "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶] 5. Excessive or inadequate damages. [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law. [¶] . . . [¶] When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated. [¶] A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision. [¶] The order passing upon and determining the motion must be made and entered as provided in Section 660 and if the motion is granted must state the ground or grounds relied upon by the court, and may contain the specification of reasons. . . . [¶] On appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons, except that (a) the order shall not be affirmed upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, unless such ground is stated in the order granting the motion and (b) on appeal from an order granting a new trial upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."

39

In opposing Colmac's new trial motion, DMF contended the juror declarations submitted by Colmac were inadmissible because they impermissibly showed the jurors' subjective reasoning process regarding the award of reputation damages. DMF alternatively contended if such declarations were admissible, Colmac did not carry its burden to show jury misconduct in calculating this award because DMF included four juror affidavits of its own showing the jury did not base that award on the alleged value of Colmac.

At the hearing on the motion for new trial, the court ruled none of the juror declarations were admissible as they all went to the jury's collective thought process. As noted, the court conditionally granted Colmac's new trial motion unless DMF agreed to accept a remittitur to $400,000 (not including the $100,000 punitive damages award). In conditionally granting the motion, the court found the evidence of *actual* reputation damage was insufficient because the "only damage to reputation" of DMF was "economic damage," which the jury found was $400,000. The court also found DMF's damages were "all economic" and found the evidence supported the $400,000 award for economic loss.

A day after the hearing on the motion for new trial, the court issued its ruling conditionally granting the motion. The March 13, 2013 order in part provides:

"For the reasons stated at the hearing and in the tentative ruling, the motion for a new trial is granted as to damages under the seventh cause of action, for defamation. The new trial will be as to all damages awarded under that cause of action. However, the motion is granted conditionally on the reduction of the damages awarded on that cause of

action to $500,000.  If plaintiff notifies the Court by a declaration signed by its attorney of record that it accepts the remittitur, then the motion for a new trial shall be denied."

Colmac subsequently appeared ex parte before the court regarding the new trial motion.  Relying on Code of Civil Procedure section 657, Colmac suggested the court's March 13 should order be modified to (1) state the specific ground under that statute in support of that order and (2) provide the "'statement of reasons'" for the new trial order.  Colmac also informed the court that DMF had rejected the remittitur.  In response, the court in its March 22, 2013 order modified the March 13 order in part as follows:

"As discussed at the hearing of these motions and described in the order filed March 13, 2013, the Court believes that the evidence admitted at trial does not support the damages for loss of reputation under the defamation cause of action and that the damages under the defamation cause of action are excessive.  The evidence supported the $400,000 but not the $1.35 million for loss of reputation.  Indeed, the only harm to reputation appears to be lost business, which was speculative other than the $400,000 awarded by the jury.  The Court stated that it would deny the motion if Plaintiff DMF Trucking accepted a remittitur of damages under the defamation cause of action to $500,000 (including $100,000 in punitive damages).  It has been informed that plaintiff has chosen not to accept the remittitur.  Therefore, the Court grants the motion for a new trial on damages under the defamation cause of action under California Code of Civil Procedure sections 657(5) and 657(6)."  (Italics omitted.)

B.  *Governing Law*

"The normal standard of review of an order granting a new trial motion is both well established and highly deferential.  A new trial motion 'is addressed to the judge's

41

sound discretion; [the judge] is vested with the authority, for example, to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact; on appeal, all presumptions are in favor of the order as against the verdict, and the reviewing court will not disturb the ruling unless a manifest and unmistakable abuse of discretion is made to appear.'  [Citation.]  In exercising its broad discretion, 'the trial court may draw inferences opposed to those accepted by the jury, and may thus resolve the conflicting inferences in favor of the moving party, for "[i]t is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court."'  [Citation.]  While the reviewing court must consider only those reasons for granting the motion stated by the trial court in its order, within those confines the question on appeal from an order conditionally granting a new trial on the basis of excessiveness of damages is simply 'whether a verdict for an amount considerably less than that awarded [by the jury] would have had reasonable and substantial support in the evidence.'  [Citation.]"  (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 379 (*Horsford*).)

Thus, when a trial court has granted a new trial on the grounds of "[e]xcessive . . . damages" or "[i]nsufficiency of the evidence" (Code Civ. Proc., § 657, subds. 5 & 6), "'we have held that an order granting a new trial under section 657 "must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory." [Citation.] Moreover, "[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . ." [Citation.] In

42

other words, "the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order." [Citation.] [¶] The reason for this deference "is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact." [Citation.] Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations. [¶] . . . The trial court . . . is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials. The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons.' (*Lane v. Hughes Aircraft Co.* [(2000)] 22 Cal.4th [405,] 411–412, italics omitted.)" (*Horsford*, *supra*, 132 Cal.App.4th at p. 386.)

C. *Analysis*

Here, we conclude the trial court's order granting a new trial on the issue of defamation damages complied with Code of Civil Procedure section 657. The record shows the court in its March 22, 2013 modified order set forth the grounds for granting the new trial motion, namely insufficient evidence to support the damage award for reputation harm and, in the alternative, the excessiveness of that award. Moreover, the record shows the court provided the reasons for its conclusion, noting the evidence supported awarding $400,000 in damages for economic harm when DMF was unable to fulfill the Gold Coast Recycling contract after Colmac terminated the services contract with DMF.

Furthermore, the record supports the court's determination that the evidence was inadequate to support the $1.35 million in reputation damages and/or that this award was excessive. Indeed, there is no dispute here the DMF was *not* entitled to damages from Colmac as a result of Colmac's termination of the services contract, which the record shows netted DMF several million dollars each year. DMF admitted during the trial, including during closing argument, that DMF brought the lawsuit "because of what was said [by Bates] to those drivers *after* [DMF was] terminated." (Italics added.) Thus, although the record shows millions of dollars "changed hands between DMF . . . and Colmac every year," as DMF contends, the trial court could reasonably find this evidence did *not* support the $1.35 million award for reputation harm.

In addition, the record shows McNulty testified as DMF's economic expert that DMF suffered losses of about $117,000 each year as a result of its inability to hire and train new drivers to perform the Gold Coast Recycling contract. There is no other evidence in the record of any additional losses other than the testimony of McNulty. Although her testimony supports the jury's award of $400,000 in damages for lost business, a finding not challenged by Colmac on appeal,[10] we conclude the trial court, reweighing the evidence as it is permitted when deciding a new trial motion, could conclude this figure did *not* support the $1.35 million reputation award.

Indeed, to support the reputation award, DMF would have been required to perform the Gold Coast Recycling contract for more than *10 years*. (See *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 60 [noting that "'[no] hard and fast rule can be

---

10      See footnote 2, *ante*.

laid down as to the content of such a specification [as required in Code of Civil Procedure section 657], and it will necessarily vary according to the facts and circumstances of each case'" and noting that when the ground relied on is insufficiency of the evidence, "the trial judge's specification of reasons 'must briefly identify the portion of the record which convinces the judge "that the court or jury clearly should have reached a different verdict or decision"'"].)

Finally, that the jury was entitled to award DMF "assumed" damages for harm to its reputation also does not justify the $1.35 million reputation award in this case, as DMF alternatively contends.[11]  The record instead shows the jury in the verdict form left *blank* the award of assumed damages when it sought to award DMF "actual" damages for such harm.[12]

---

[11]     The record shows the court instructed the jury with modified CACI No. 1704, which neither party challenges on appeal.  This instruction provided that even if DMF "has not proved any actual damages for harm to reputation, the law assumes that it has suffered this harm"; that DMF was entitled to receive compensation for such assumed harm in whatever sum the jury found reasonable; and that the jury was required to award DMF "at least a nominal sum, such as one dollar" for such presumed harm.

[12]     In light of our decision, we deem it unnecessary to decide if the trial court erred when it found the juror declarations submitted both by Colmac and DMF were inadmissible under Evidence Code section 1150, subdivision (a).

DISPOSITION

Colmac's appeal to the judgment is dismissed.  Colmac's appeal to the court's order denying its JNOV motion is affirmed.  DMF's appeal to the court's order granting Colmac's motion for new trial on defamation damages is affirmed.  Each party to bear their own costs of appeal.


BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


HALLER, J.